ANASTASIA V. WOOTTEN,

                       *Plaintiff,*

        v.

COMMONWEALTH OF VIRGINIA,
ET AL,

                      *Defendant.*

CIVIL ACTION NO. 6:14-CV-00013

**MEMORANDUM OPINION**

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

Plaintiff Anastasia V. Wootten alleges the following: "[g]ender and national origin discrimination, and retaliation for the exercise of protected rights, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* (the 'Title VII claims')"; the "[v]iolation of rights protected by the Constitution of the United States of America and its Amendments, pursuant to 42 U.S.C. § 1983"; a "[v]iolation of 42 U.S.C. § 1981"; and a "[v]iolation of the Driver's Privacy Protection Act (18 U.S.C. §§ 2721, *et seq.*)." For the reasons stated herein, the motion to dismiss for failure to state a claim will be granted, in part, and denied, in part.

## I.

When considering a motion to dismiss for failure to state a claim upon which relief can be granted, I apply the pleading standard refined by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *See also* Fed. R. Civ. P. 12(b)(6), Fed. R. Civ. P. 8. The non-moving party must have alleged facts that "state a claim to relief that is plausible on its face," *i.e.*, facts that "have nudged their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. A claim is plausible if the complaint contains "factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," but it must allege "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). A plausible claim is one that contains more than just "unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Id*. Although the long-held rule still stands that, "in evaluating a Rule 12(b)(6) motion to dismiss, a court accepts all well-pled facts as true and construes these facts in the light most favorable to the [non-moving party] in weighing the legal sufficiency of the complaint," *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted), a complaint must allege "facts to state [the] elements of the claim," *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 291 (4th Cir. 2012); *see also Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012).

## II.

Given the legal conclusions Plaintiff draws from her lengthy factual allegations, which are heavily weighted with inferences and speculation, I will quote the complaint extensively.[1]

---

[1] The first 21 or so pages of the complaint contain Plaintiff's factual allegations, and the remaining pages set forth Plaintiff's legal conclusions under eight counts. As Defendants describe it, it is a "kitchen-sink Complaint." Even under the liberal construction of pleadings afforded to pro se litigants, a court is not obliged to ferret through a complaint, searching for viable claims. *See Holsey v. Collins*, 90 F.R.D. 122 (D. Md. 1981) (although pro se complaint contained potentially viable claims, the court properly dismissed without prejudice under Rule 8 of the Federal Rules of Civil Procedure because a voluminous, repetitive, and conclusory complaint is not a "short and plain statement" of facts and legal claims; the court specifically observed that dismissal under Rule 8 was proper because such a complaint "places an unjustifiable burden on defendants to determine the nature of the claim against them and to speculate on what their defenses might be," and "imposes a similar burden on the court to sort out the facts now hidden in a mass of charges, arguments, generalizations and rumors"); *see also Spencer v. Hedges*, 838 F.2d 1210 (4th Cir.1988) (unpublished table decision). District courts are not required "to conjure up questions never squarely presented to them." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir.1985) (adding that "[d]istrict judges are not mind readers").

The instant complaint does not comply with the requirements of Rule 8. Rule 8(a)(1) calls for "a short and plain statement of the grounds for the court's jurisdiction," Rule 8(a)(2) requires "a short and plain

(continued...)

-2-

Plaintiff states that she "is a female, Russian-born, citizen of the United States, and a long-time law enforcement officer, who became employed by [the Virginia Department of Motor Vehicles ("DMV")] as a Senior Special Agent [('SSA')] on or about May 10, 2011." She alleges that, in March 2011, when she was interviewed for a position as a SSA in the DMV's "Lynchburg Law Enforcement Services Division," "[d]efendant Jennifer Dawson, a Caucasian/white female, who worked in the Law Enforcement Services Division Lynchburg office, became aware that Wootten and at least two other females were being interviewed for the open position in the Lynchburg office for a law enforcement position." According to Plaintiff, "Dawson told David Stultz, the Special Agent in Charge ('SAC') of the Lynchburg DMV law enforcement office, not to hire a female and that a female in their office would not be a good fit." Nonetheless, despite Dawson's alleged foreboding, Plaintiff "was announced as the new law enforcement officer for the Lynchburg office." According to Plaintiff, Dawson consequently "expressed to SAC Stultz her displeasure with a female having been selected for the position" and, after Plaintiff "started work with DMV, Dawson complained to another DMV law enforcement employee that immigrants should not get jobs that are for Americans . . . ."

The first subsection of the "**FACTS**" section of the complaint is subtitled "**Setting the Stage**," wherein Plaintiff alleges that, soon after she began her employment with the DMV, she "became

---

[1](...continued)

statement of the claim showing that the pleader is entitled to relief," and Rule 8(d)(1) requires that each averment of a pleading be "simple, concise, and direct." A pleading "does not have to set out in detail the facts on which the claim for relief is based," 2 Moore's Federal Practice ¶ 8.04[1], at 8–22 (3d ed.2002), but must give the court and the defendant "fair notice of what that plaintiff's claim is and the grounds upon which it rests." *Swirkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A court may dismiss a complaint that is "so confused, ambiguous, vague or otherwise unintelligible that its true substance, if any, is well disguised." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). Here, the complaint is not a "short and plain statement," nor is it "simple, concise, and direct," as required by Rule 8, and I could have dismissed it on that ground.

-3-

aware that Dawson had serious and significant issues in her employment, primarily regarding her ability to interact with officers in the Law Enforcement Services Division and other DMV employees, and her ability to effectively carry out the duties of her position." Plaintiff adds that, between May 2011 and March 2012, she "came to believe that Dawson had serious mental health issues based upon her observations of Dawson." She alleges that she witnessed Dawson "[y]ell[ing]" and "scream[ing] at persons on the telephone"; "[t]hrow[ing] items in the office"; "[c]ry[ing] uncontrollably"; "[r]un[ning] from her office in distress"; "[i]mply[ing] to citizens that she was a law enforcement agent"; "[r]efus[ing] to communicate with law enforcement officers," "despite her job being to provide administrative support to the Lynchburg Law Enforcement Services Group"; "[m]aking false allegations against coworkers"; "[i]llegally possessing a weapon on DMV/state property"; and "[f]ailing to perform tasks that were a part of her job in a manner that suggested Dawson was intentionally orchestrating circumstances to make it appear that other persons were actually at fault for a task not being completed."

Plaintiff states that she

was also aware of other events involving Dawson, such as committing assaults and batteries on two other law enforcement officers in the Lynchburg office, being found hiding under her desk, demanding enhanced security equipment be installed at the office due to her paranoia, stating that she feared her step-son would try to kill her, demanding that individual officers' doors be left open for her to retreat to in case of an emergency, [and] turning all the lights off in the office and hiding after she requested, for security reasons, that lights be left on in the office.

Plaintiff adds that, "to protect themselves from accusations [Dawson] might allege," "agents in the Lynchburg office would not go to the office alone when Dawson was there," and "therefore, had to always go to the office in pairs when Dawson was present, thereby wasting state resources in the form of manpower."

In the subsection of her factual allegations subtitled "**Reporting Concerns Regarding**

-4-

**Dawson**," Plaintiff states that she "brought her concerns to Assistant Special Agent in Charge ("ASAC") Robert Supinger and SAC Stultz," but "[d]espite what Wootten understood to be the proper and repeated efforts of Stultz to obtain permission from his superiors . . . to take action with regard to Dawson's behavior and actions in the workplace, no action was taken to address the situation with Dawson." Plaintiff alleges that she "understood from Supinger and Stultz that the reason no action was taken to address Dawson's workplace actions and behavior was that officials higher in the chain of command at DMV . . . prohibited Stultz from taking any action," and Plaintiff states her conclusion that the following named defendants "refused to permit action to be taken against Dawson": Donald Boswell, identified as "the Law Enforcement Director of DMV"; Joseph Hill, "the Assistant Commissioner of DMV"; Jeannie Thorpe, "the Human Resources Director of DMV"; David Mitchell, "the Deputy Commissioner of DMV"; and Richard Holcomb, "the Commissioner of DMV." Plaintiff states that she personally "reported her concerns directly to" the following named defendants: Boswell, Hill, Mitchell, Holcomb, and John Gazzola, "the manager of DMV Human Resources." She adds that she also directly reported her concerns to "Tim Sadler with the Division of Internal Audit under the Commonwealth's Department of Accounts, which administers the Commonwealth's Fraud, Waste and Abuse Hotline (i.e., The Fraud and Whistleblower Protection Act, Va. Code § 2.2-3009, et seq.)," and that she "also is aware that one or more other DMV employees notified the Commonwealth's Secretary of Transportation, Sean Connaughton, of the circumstances surrounding Dawson at the Lynchburg office."

Plaintiff further states that, "along with other DMV law enforcement officers," she "spoke directly to Commissioner Holcomb on March 15, 2012 in Albemarle County about their concerns with Dawson."

Proceeding to the subsection of her complaint subtitled "**Setting the Stage for Retaliation**

**under Title VII**," Plaintiff states that, the day after the meeting, "DMV announced that it was transferring ASAC Supinger from Lynchburg to Waynesboro." The "stated reason for the transfer was that it was in the spirit of compliance with DMV's nepotism policy because Supinger's wife, an Asian female, worked in the same building," but Plaintiff adds that Supinger, "who attended the meeting with Commissioner Holcomb," and Supinger's "wife . . . had worked for DMV on different floors of the same building for over 12 years." Plaintiff further states that she "was present when defendant Boswell told Supinger that he violated the nepotism policy and must be transferred to Waynesboro," which required a longer commute for Supinger. Supinger "filed a grievance over the transfer," the investigation of which "revealed that several married couples worked for DMV out of the same office," but "Supinger and his wife were the only non-white/Caucasian, Asian couple among this similarly situated group and were the only couple in which one of the spouses was involuntarily transferred, purportedly due to DMV's nepotism policy." Nonetheless, "DMV did not reverse this decision," and "Supinger filed a Charge of Discrimination with the Equal Employment Opportunity Commission ('EEOC')."

"In the meantime," Plaintiff continues in the subsection of the complaint subtitled "**More Reports Regarding Dawson**," "no action was taken with regard to Dawson," despite Plaintiff's "reports and complaints." Plaintiff adds that, "[u]nbeknownst to [her] at the time, Dawson was communicating directly with Hill" and defendant Gloria Winston, "a Human Resources Representative for DMV," and was communicating "directly and indirectly with other defendants about what was occurring at the Lynchburg office, and conspiring with the defendants to negatively affect Wootten in her employment."

Dissatisfied with DMV's inaction, Plaintiff and several of her colleagues "attempted to meet with [Virginia] State Senator Steve Newman April 27, 2012. Plaintiff states that, "[i]nstead of

-6-

meeting with all of the officers, Senator Newman requested that all but one officer leave his office

once he learned the reason why they had come to speak to him," and Plaintiff "and the other officers

waited in another room while the lone officer spoke to Newman on behalf of all the officers."

"Before Wooten left Newman's officer, however, she did express her concerns about the Lynchburg

DMV officer to Newman," and

> [t]he officer who remained in the office to speak to Senator Newman told him about the
> officers' concerns for public safety and the wasting of state resources in how Dawson
> was being permitted to behave in the workplace and interrupt and disrupt the effective
> operation of the office and provision of services to the public. For example, the law-
> enforcement agents in the Lynchburg office would not go to the office alone when
> Dawson was there (to protect themselves from accusations she might allege) and,
> therefore, had to always go to the office in pairs when Dawson was present, thereby
> wasting state resources in the form of manpower.

Plaintiff complains that, "[u]nbeknownst to [her] at the time, Newman had already intervened

on Dawson's behalf and spoken with the other defendants about the circumstances then existing in

the Lynchburg office," and that, "[a]fter the April 27 meeting," Newman "notified the defendants

of the meeting with the officers" and identified "who had come to his office and the reasons why

Wooten and the other officers had come to speak to him." According to Plaintiff, "DMV officials

then chastised [her] for going to speak to Senator Newman, and told her not to speak to persons

outside of DMV, especially not elected officials, about what was going on with Dawson."

Proceeding to the subsection of her complaint subtitled "**More Groundwork for Title VII**

**Retaliation**," Plaintiff alleges that, "in June of 2012, DMV suddenly announced that it was

reorganizing, effective October 1, 2012, despite a previously disseminated decision to the contrary."

According to Plaintiff, "[t]his reorganization would return DMV to geographic boundaries in use

approximately six years before, thereby eliminating the Lynchburg office and creating a larger

Roanoke 'District,'" and these plans "included leaving both ASAC Supinger and a less senior

-7-

female ASAC in the to-be-created and much larger Roanoke 'District.'" However, in August 2012 DMV "altered this . . . plan and notified ASAC Supinger that as part of the reorganization he would be transferred a second time, to a separate DMV work unit, Fuel Tax Enforcement (FTE)," and "DMV stated that the female ASAC would remain in place within the new Roanoke District despite the fact that . . . she had less overall seniority in law enforcement, fewer years of employment at DMV[,] and had served less time as an ASAC than Supinger." "As with his first transfer, . . . ASAC Supinger filed another grievance," but again, "DMV did not reverse its decision . . . ." And, according to Plaintiff, after DMV "failed" to grant Supinger the relief sought in his grievances, she "was present when defendant Mitchell told Supinger that different rules apply to field officers from headquarters (*i.e.*, regarding the nepotism policy), and that if management decided not to act on a violation then we should accept it and move on."

The next subsection of the complaint is subtitled "**Dawson Assaults Wootten**." Plaintiff alleges that, "on September 13, 2012, Dawson committed an assault and battery on SSA Wootten in a public ladies restroom at the Lynchburg office." Plaintiff "immediately reported the incident" to Stultz and Supinger, and "Stultz notified his superiors, including the defendants named" in the complaint, but "[o]ver the ensuing 24 hours . . . defendants refused to take any action to address Dawson's behaviors and actions." Plaintiff "then consulted with the Lynchburg Commonwealth Attorney's Office and thereafter obtained a warrant for assault and battery against Dawson for the incident." According to Plaintiff, "Boswell, Hill, Thorpe, and Holcomb threatened to suspend and terminate [her] because she obtained a warrant against Dawson," and they also "had demanded that Stultz order Wootten not to obtain a warrant for Dawson."

The subsection subtitled "**The Retaliation Begins**" states that, "[o]n September 16, 2012, Boswell ordered Wootten to report to Richmond to be interviewed about what had occurred with

-8-

Dawson," and that, "[o]n September 17, 2012," named defendant "Tom Penny, the Director of Fuels Tax for the Department of Motor Vehicles, who lacked training in internal investigations of law enforcement personnel, interrogated SSA Wootten, at the direction of the other defendants, concerning the events that led to the assault and battery charge against Dawson." Plaintiff complains that, "[d]uring the interrogation, Penny inferred that Wootten had committed some sort of misconduct for obtaining a warrant against Dawson," even though "no defendant" had "notified Wootten that she was being investigated for misconduct as required by her procedural guarantees with the Law Enforcement Officers Procedural Guarantees Act ('LEOPGA') (Virginia Code § 9.1-500, et seq.)."

According to Plaintiff, "[o]n October 3, 2012, the Assistant Attorney for the Commonwealth for the City of Lynchburg" notified Plaintiff that "Joe Hill and an unnamed female with DMV" had "request[ed] that the assault and battery charge against Dawson be dropped," even though "[n]either Hill, nor the unnamed female [DMV employee had] notified Wootten of their intention to contact the Commonwealth Attorney to request that the charge . . . dropped." On October 11, 2012, in Richmond, "[d]efendants interrogated, or directed the interrogation of Wootten . . . about the situation involving Dawson and the assault and battery warrant taken out against Dawson." Plaintff complains that "the nature of the interrogation was . . . accusatory," although she "was told that she was not under investigation," and she "was not provided notice as required by the LEOPGA."

Plaintiff adds that "[d]efendants recorded their September 17[, 2012,] and October 11[, 2012,] interrogations of Wootten" and, although "[t]hese interrogations were internal affairs matters," the "DMV released transcripts of these recordings to the attorney representing Dawson," who then "cross-examined Wootten with the transcripts at trial of Dawson's Assault and Battery charge." Plaintiff further complains that "[d]efendants also interrogated, or directed the interrogation of other

-9-

law enforcement officers from the Lynchburg office under the guise of investigating the assault and battery incident involving Dawson and Wootten," but "Supinger, the DMV agent assigned to investigate the case involving Dawson, was not involved in these interrogations, and, in fact, . . . was one of the DMV employees interrogated by defendants about the matter." According to Plaintiff, "Supinger became concerned that these interrogations were intimidating witnesses in the assault and battery case against Dawson," and he therefore "requested assistance of the DMV Human Resources Office ('HRO') that the interrogations stop," but named defendant "William Anderson, a Senior Employee Relations Analyst for DMV HRO advised Supinger that HRO would take no action to stop the interrogations."

The next subsection, subtitled "**Wootten Again Speaks Out to Petition for Help**," states that, "[o]n October 12, 2012, Wootten and other law enforcement officers met with State Senator Creigh Deeds to discuss the circumstances existing in the Lynchburg DMV office." Plaintiff states that "discussion was had about matters of public concern," including Dawson's alleged disruptions of the office and the resulting risks to safety and waste of public resources, which, according to Plaintiff, DMV had ignored.

The next subsection is subtitled "**Defendants Retaliate for Speaking Out**," and it states that, when "[d]efendants learned of Wootten's and the other law enforcement officers' meeting with Senator Deeds," Plaintiff "and the other law enforcement officers were warned against discussing DMV matters outside of the DMV, in violation of Virginia Code § 2.2-2902.1." The complaint continues as follows (paragraph numbering omitted):

> Defendant Boswell told SAC Stultz that talking to Senator Deeds about these matters was an embarrassment to Holcomb, and that Holcomb would not tolerate anyone talking about these matters outside of DMV, especially not to elected officials.
>
> Boswell told SAC Stultz that reporting problems to politicians had brought all

this into the political realm and that politics was now fully involved, that Holcomb had rebounded from his 9/11 fiasco and would be sure others paid the price for this as well, and that Holcomb was not going to be embarrassed or take any blame.

Boswell told Stultz that Holcomb was a political survivor and that this entire situation would be turned on SAC Stultz and his coworkers (including Wooten).

Defendant Boswell specifically told SAC Stultz that defendants were intent that Wooten's career would not survive, and reiterated that going outside DMV (to politicians) was unforgivable by Holcomb.

Plaintiff states that "[d]efendant Hill then accessed or caused to be accessed DMV's driver's license records to obtain the driver's license information of Wooten (and other DMV employees), including her photograph." According to Plaintiff, "[t]his information constitutes Wooten's restricted and highly restricted personal information, under the federal Driver's Privacy Protection Act," and which Hill provided "to [the] Capital [*sic*] Police at the Virginia General Assembly Building with instruction to be on the look out for Wooten should she come to the General Assembly Building to impede Wooten's attempt to speak to her elected officials."

The next subsection, "**More Groundwork for Title VII Retaliation**," states that, "[a]fter DMV failed to resolve ASAC Supinger's grievances about his transfers he filed Charges of Discrimination with the Equal Employment Opportunity Commission," which "DMV learned of . . . in January 2013, if not earlier." Plaintiff adds that, "[u]pon learning of ASAC Supinger's Charges DMV also determined . . . that SSA Wooten was participating as a witness in ASAC Supinger's EEOC proceedings . . . ."

The following subsection, subtitled "**Dawson's Trial on the Assault and Battery Charge**," states that the "[t]rial of the assault and battery warrant against Dawson occurred in the General District Court for the City of Lynchburg on January 29, 2013," and that

[t]he trial court, while admitting that physical contact had occurred between Dawson and Wooten and that Dawson had misrepresented what had occurred, found that the

-11-

contact did not rise to the level of a criminal assault and battery, and therefore the court dismissed the warrant charging Dawson with assault and battery.

The last subsection of Plaintiff's "**FACTS**" section is subtitled "**The Retaliation Reaches its**

**Climax.**"  Plaintiff states that,

[o]n February 5, 2013[,] defendants against summoned Wootten to DMV headquarters in Richmond where she was interrogated a third time, for four hours, by Penny and [named defendant] Ronna Howard, again regarding the events that led to the assault and battery charge against Dawson and other complaints about Dawson's behavior in the workplace.

Plaintiff alleges that, regarding this and "the two prior interrogations, defendants required [her] to appear as a condition of her employment upon threat of discipline if she failed to appear and/or fully answer its questions."  In Plaintiff's view, "it became apparent that while [she] was not on notice that she was being suspected of wrongdoing that was obviously the purpose of the interrogation," including "being questioned about why she had spoken to Senator Deeds (in violation of Virginia Code § 2.2-2902.1)."  She adds that she "was not provided notice as required by the LEOPGA.  She states that she could tell "by the questions asked" that "it was clear that defendants knew that [she] was a witness in Supinger's EEOC proceeding" and that the DMV learned from her "responses to DMV's questioning . . . that [she] was, and would cooperate as a witness in support of ASAC Supinger's EEOC proceedings arising out of his Charges of Discrimination."

"By this time," Plaintiff alleges, the defendants, including "Commissioner Holcomb, had already conspired and formed the intent to terminate [her] employment."  "On February 28, 2013," she states, "DMV suspended [her] at the direction of Hill," and

[o]n March 6, 2013, Hill issued what appeared to be an allegation letter to Wootten accusing her of improper activity.  While this letter stated that Wootten had an opportunity to provide mitigating circumstances regarding what discipline should be taken against her, the letter also stated that a decision to terminate her had already been made.

-12-

Plaintiff alleges that, "[a]fter receiving the letter," she "was not interviewed or otherwise given the opportunity to provide information to dispute her proposed termination." She states that Hill notified her on April 5, 2013, "that she was terminated from her employment with DMV," and since then, she "has attempted to grieve her termination and elected to pursue a grievance under the LEOPGA," but "DMV has refused to provide a hearing for" her. She maintains that "DMV has no policy in place, as required by state law, to administer grievance proceedings under the LEOPGA."

## III.

In Count I, Plaintiff claims "**Title VII Gender Discrimination and Harassment Against Only the Commonwealth and DMV**."

Title VII prohibits discrimination on the basis of sex in the terms and conditions of employment, and an employee's work environment is a term or condition of her employment; if the environment is hostile to her gender, she has a cause of action. *See* 42 U.S.C. § 2000e-2(a); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66-67 (1986). Employer liability for the "hostile or abusive work environment" requires that "(1) the subject conduct was unwelcome; (2) it was *based on the sex of the plaintiff*; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer." *Spicer v. Com. of Va., Dept. of Corrections*, 66 F.3d 705, 710 (4th Cir. 1995) (en banc) (emphasis added); *Ocheltree v. Scollon Prods, Inc.*, 335 F.3d 325, 338 (4th Cir. 2003) (en banc).

> Workplace conduct is not measured in isolation; instead, "whether an environment is sufficiently hostile or abusive" must be judged "by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"

*Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001)) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)).

Plaintiff does not allege the segregation or suspect classification of women in her workplace at DMV. *See* 42 U.S.C. § 2000e-2(a)(1). And, although discrimination based on disparate treatment and job termination, which is prohibited under 42 U.S.C. 2000e-2(a)(2), may be established by direct evidence that Plaintiff's gender triggered the adverse treatment, *see Hill v. Lockheed Martin Logistics Mgmt*, 354 F.3d 277, 284-85 (4th Cir. 2004) (en banc), Plaintiff's allegations do not allege such evidence. In the absence of direct evidence, then, Plaintiff must satisfy the test set forth by the Supreme Court of the United States in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-03 (1973). To demonstrate discrimination under *McDonnell Douglas*, a plaintiff must submit facts alleging that 1) she is a member of a protected class; 2) she was qualified for the job and met her employer's legitimate expectations; 3) she endured an adverse employment action; and 4) the *inference may be drawn from the circumstances* that unlawful discrimination was involved. *See Taylor v. Virginia Union Univ.*, 193 F.3d 219, 230 (4th Cir. 1999) (emphasis added) (*abrogated on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003), *as recognized by Hill*, 354 F.3d at 284); *see also Adams v. Trustees of the University of N.C.-Wilmington*, 640 F.3d 550, 558 (April 6, 2011).

Significantly, a defendant can be liable for the intentional mistreatment of a member of a protected class only when the unlawful discrimination is because of membership in the protected group. "The 'factual inquiry' in a Title VII case is 'whether the defendant intentionally discriminated against the plaintiff.'" *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248,

-14-

253 (1981)). "In other words, is 'the employer . . . treating some people less favorably than others because of their race, color, religion, sex, or national origin.'" *Id.* (quoting *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978) (quoting *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335, n. 15 (1977))).

Plaintiff's allegations state that her colleagues, both male and female, suffered the consequences of Dawson's workplace behavior. She alleges no differences between the treatment of female and male employees in the DMV's Law Enforcement Services Division ("LES") in Lynchburg. Plaintiff alleges that her female co-worker Dawson assaulted her in a restroom at work, but she alleges no gender motivation on Dawson's part. She alleges that DMV deployed a female employee to investigate the alleged bathroom assault, and alleges no discriminatory animus on that investigator's part. There is no allegation that, because Plaintiff is a woman, she was blackballed, ignored, treated unfairly, or specifically chosen for job termination.

> Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against individuals "[w]ith respect to . . . terms, conditions, or privileges of employment, because of such individual's . . . sex [.]" 42 U.S.C. § 2000e–2. "Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." *EEOC v. R & R Ventures*, 244 F.3d 334, 338 (4th Cir. 2001). A hostile work environment is one "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) (citations and internal quotation marks omitted).

*Walker v. Mod-U-Kraft Homes, LLC*, 775 F.3d 202, 207 (2014). Here, however, Plaintiff lodges no allegations from which it can be reasonably inferred that the decision to terminate her employment was motivated by consideration of her gender.[2] Thus, she has not pleaded a cause of action for

---

[2] The imputation of gender bias in a termination decision requires facts linking the decision to terminate with Plaintiff's gender, and Plaintiff does not state any such facts. Moreover, Holcomb was the Commissioner
(continued...)

-15-

"gender discrimination and harassment." "[W]hether 'harassment was sufficiently severe or pervasive is quintessentially a question of fact,'" *id.* (quoting *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 773 (4th Cir.1997) (quoting *Paroline v. Unisys Corp.*, 879 F.2d 100, 105 (4th Cir.1989))), but all Plaintiff has alleged is that she is a woman who got fired after being assaulted by another woman at work. She has not alleged harassment, much less "gender-oriented harassment amount[ing] to actionable (severe or pervasive) discrimination . . . ." *Jennings v. Univ. of N.C.*, 482 F.3d 686, 696 (4th Cir. 2007).

## IV.

Count II claims "**Title VII National Origin Discrimination and Harassment Against Only the Commonwealth and DMV.**"

The complaint alleges that Plaintiff's national origin is Russian, and that Dawson, a non-supervisory co-worker, "voiced her discriminatory national origin *animus* toward Wootten around the time that Wootten was hired." Specifically, the complaint states that, after Plaintiff "started work with DMV, Dawson complained to another [unidentified] DMV law enforcement employee that immigrants should not get jobs that are for Americans . . . ." Plaintiff maintains that Dawson conspired with others to harass and injure Plaintiff, including subjecting her to interrogation; that the harassment was severe or pervasive; and that, as a result of Dawson's negative animus, Plaintiff

---

[2](...continued)
of DMV when Plaintiff was hired, and he was the Commissioner when Plaintiff was fired. When the same decision-maker both hires and fires a specific employee, the presumption lies against any finding that a person's protected status played a role in the decision to fire the employee. *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991) ("When the hirer and firer are the same individual, there is a powerful inference relating to the 'ultimate question' that discrimination did not motivate the employer, and the early resolution of this question need not be derailed by strict fealty to proof schemes.").

was terminated from her employment with the DMV.[3]

National origin harassment claims require evidence that (1) the plaintiff "experienced unwelcome harassment"; (2) "the harassment was based on her [protected status]"; (3) "the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere"; and (4) "there is some basis for imposing liability on the employer." *Bass v. E. I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003). Here, Plaintiff has not even alleged any harassment because of her origin, much less harassment that could be imputed to DMV, and that deficiency is fatal to the claim.[4]

---

[3] Dawson, described in the complaint as an employee who "provide[d] administrative support to the Lynchburg Law Enforcement Services Group," was not a decision-maker at DMV. At the hearing on the motion to dismiss, Plaintiff's counsel acknowledged this fact. Dawson had no authority over Plaintiff. Dawson did not interview, interrogate, or fire Plaintiff. Given that Dawson was not a decision-maker with authority over Plaintiff, the complaint must allege how Dawson, the biased individual, ultimately influenced the decision-maker. *Staub v. Proctor Hospital*, 562 U.S. ___, ___, 131 S. Ct. 1186, 1194 (2011) (after determining that the Uniformed Services Employment and Reemployment Rights Act "is very similar to Title VII," *id*. at 1191, the Court, citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 798-99 (1998) ("[a] 'reprimand . . . for workplace failings' constitutes conduct within the scope of an agent's employment"), found that "there was evidence that Mulally's and Korenchuk's actions were motivated by hostility toward Staub's [statutorily protected status]. There was also evidence that Mulally's and Korenchuk's actions were causal factors underlying Buck's decision to fire Staub."). Here, the absolute most Plaintiff alleges is Dawson's "complaint" to an unnamed "DMV law enforcement employee that immigrants should not get jobs that are for Americans . . . ." I further note that the complaint does not suggest that the unnamed DMV to whom Dawson allegedly made the comment is one of the named defendants.

[4] As I have already noted, when the same decision-maker both hires and fires a specific employee, the presumption lies against any finding that a person's protected status played a role in the decision to fire the employee. *Proud*, 945 F.2d at 798. Moreover, the instant complaint makes no mention of any Russian stereotype, or any consideration of Plaintiff's Russian background at any stage of the complained-of events. In sum, Plaintiff has not lodged any allegations that there were any hostile conditions based on her national origin that prevented her from performing her job. *See, e.g., McCleary-Evans v. Maryland Dept. of Transp., State Highway Admin.*, ___ F.3d ___ (4th Cir. March 13, 2015) (affirming dismissal of Title VII claim for failure to state a claim); *see also Buchanan v. ICF Int'l. Inc.*, 545 F. App'x 217, 219 (4th Cir. 2013) (holding that the conduct described in the complaint fell short of being severe or pervasive enough to establish an abusive environment, where the plaintiff alleged that her supervisor, over the course of nine months, yelled at her at meetings, made "snide comments" to her, "play[ed] favorites with employees and pitt[ed] employees against each other," and "unfairly scrutinize[ed] and criticized" the plaintiff's use of leave and her compliance with the supervisor's directives); *see also Bass*, 324 F.3d at 765 (emphasizing that while the plaintiff's

(continued...)

# V.

Count III claims "**Title VII Retaliation Against Only the Commonwealth and DMV**."  In sum, Plaintiff alleges that she was retaliated against for her actions in support of "ASAC Supinger's grievances and Charges of Discrimination."  To state a claim for Title VII retaliation, a plaintiff must show the following:  (1) that she engaged in protected activity; (2) that her employer took a materially adverse action against her (one that might have dissuaded a reasonable worker in her position from engaging in protected activity); and that, (3) but for the protected activity, the asserted adverse action would not have occurred.  *See Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. __, ___, 133 S. Ct. 2517, 2533 (2013); *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010).

Plaintiff has sufficiently alleged a plausible claim of retaliation for her participation in Supinger's Charge of Discrimination to the EEOC.  Defendants dispute that Plaintiff was engaged in "protected activity," but the cases Defendants cite provide that Plaintiff "need 'only . . . prove that [she] opposed an unlawful employment practice which she *reasonably believed* had occurred or was occurring.'"  *Peters v. Jenney*, 327 F.3d 307, 321-22 (4th Cir. 2003) (quoting *Bigge v. Albertsons, Inc.*, 894 F.2d 1497, 1503 (11th Cir. 1990)) (emphasis added).  Nor must a Title VII oppositional retaliation claimant show that the underlying claim of discrimination was in fact meritorious in order to prevail.  *See Ross v. Communications Satellite Corp.*, 759 F.2d 355, 355 n. 1 (4th Cir. 1985), *overruled on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)).  The inquiry is therefore whether Plaintiff "*subjectively* (that is, in good faith) believed that [her] employer was

---

[4](...continued)
complaint was "full of problems she experienced with her coworkers and supervisors," it did not "describe the type of severe or pervasive gender, race, or age based activity necessary to state a hostile work environment claim").

engaged in unlawful employment practices" and "also that her belief was *objectively* reasonable in light of the facts and record presented." *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1312 (11th Cir. 2002) (quotation omitted); *see also Peters*, 327 F.3d at 321 (this is "a standard which we will refer to as one of 'reasonable belief'") (citing *Weeks*, 291 F.3d at 1312).

Accordingly, the retaliation claim stated in Count III of the complaint survives the motion to dismiss.

# VI.

In Count IV, Plaintiff claims a violation of "**Free Speech and Petition Against All Defendants, Except the Commonwealth and DMV**," alleging that she was retaliated against for having "petitioned elected representatives and exercised her right to free speech by speaking to elected representatives" in her "attempt[] to remedy an ineffective and unsafe work environment."

When a government employee complains of retaliation for the exercise of her First Amendment rights, the initial question is whether her speech relates to a matter of public concern. *See Connick v. Meyers*, 461 U.S. 138, 146 (1983). "It is undisputed that public employees may not 'constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest.'" *Brooks v. Arthur*, 685 F.3d 367, 370 (4th Cir. 2012) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). "But this protection 'does not require a public office to be run as a roundtable for employee complaints over internal office affairs.'" *Id.* (quoting *Connick*, 461 U.S. at 149).

> In *Connick*, the Supreme Court stressed that "the repeated emphasis in *Pickering*" on the need for an employee to be speaking as a citizen on matters of public concern "was not accidental," *id.* at 143, but rather sets the boundaries of what speech is protected in the public employment setting.

-19-

*Id.* at 370-71.

Although "in one sense the public may always be interested in how government officers are performing their duties," such interest

> will not always suffice to show a matter of public concern. . . . The right of a public employee under the Petition Clause is a right to participate as a citizen, through petitioning activity, in the democratic process. It is not a right to transform everyday employment disputes into matters for constitutional litigation in the federal courts.

*Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. ___, ___, 131 S. Ct. 2488, 2501 (2011).

"The ultimate issue—whether the speech is protected—is a question of law." *Rankin v. McPherson*, 483 U.S. 378, 386 n. 9 (1987) (citing *Connick*, 461 U.S. at 148, n. 7). The first consideration when determining "whether a public employee has stated a First Amendment claim for retaliatory discharge," *Brooks*, 685 F.3d at 371, is to "consider 'whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest,'" *id.* (quoting *McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998). Thus, "'the threshold question'" is "whether the speech addressed a matter of public concern . . . ." *Id.* (quoting *Rankin*, 483 U.S. at 384. "If an employee's speech 'cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary . . . to scrutinize the reasons for [the employee's] discharge.'" *Id.* (quoting *Connick*, 461 U.S. at 146).

Plaintiff complains that she was reprimanded for and retaliated against for having visited two state representatives to complain about the disruptive presence of one administrative employee in Plaintiff's workplace. Plaintiff does not allege that Dawson was her superior, and other than her "conspiratorial theory" that Dawson must somehow exercise outsized influence, Plaintiff does not

-20-

allege that Dawson took any steps to endanger Plaintiff's employment.[5]  As for Plaintiff's claims regarding "workplace safety," they concern not the public at large, but Plaintiff and her colleagues in the Lynchburg LES office.  Her claims regarding "waste" describe a generalized "waste" of her and other employees' time, not the waste of specific public funds.  Plaintiff and her colleagues went to the offices of Senator Deeds and Senator Newman as constituents having a problem with their employer regarding "matters of internal policy, favoritism, and other employment-related matters," which are "not of public concern."  *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 353 (4th Cir. 2000) (concluding that a firefighter's complaints about inadequate training and equipment as well as unsafe procedures during emergency calls were matters of public concern, but complaints of favoritism, policies that were "enforced against some but not others," etc., were not matters of public concern).

"Private matters between employers and employees may be the subject of internal controversy, but whether someone's sense of fair play is offended is not the constitutional inquiry." *Brooks*, 685 F.3d at 375.  Plaintiff's First Amendment claim boils down to a complaint of favoritism extended to Dawson, "[b]ut if favoritism pertains primarily to a single individual, as both here and in *Goldstein*, that is not an issue of constitutional dimension." *Id.*  Accordingly, Plaintiff's First Amendment claim must be dismissed.[6]

---

[5] At the hearing on the motion to dismiss, Plaintiff's counsel stated that his "theory" is that, through Dawson's "connections to state Senator Steve Newman, she had the ability to bend the ears of those persons in authority with DMV in a conspiratorial fashion," and he explicitly characterized this action as being "based upon the comments by Dawson and that conspiratorial theory of the case."

[6] Additionally, government officials enjoy "qualified immunity" from civil damages when they act in an objectively reasonable fashion in light of clearly established law. *Saucier v. Katz*, 533 U.S. 194, 199 (2001); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  An assertion of qualified immunity shifts the burden to a plaintiff to show that an official's conduct violated a constitutional right and that the constitutional right was clearly established at the time the allegedly unlawful conduct occurred.  *Saucier*, 533 U.S. at 199.  The
(continued...)

# VII.

Count V alleges a violation of "**Due Process Against All Defendants**," alleging that "Wootten had a property interest in her continued employment with DMV" and that "Defendants conspired to deny [her] due process in the manner by which they investigated her and in her attempt to grieve her termination from employment, in violation of the Fifth and Fourteenth Amendments . . . and 42 U.S.C. § 1983."

Where a deprivation of property results from an established state procedure, due process requires the state to provide a pre-deprivation hearing, *see Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982); however, in certain circumstances, the availability of meaningful post-deprivation procedures satisfies the requirements of due process, *see Parratt v. Taylor*, 451 U.S. 527, 538 (1981) (due process satisfied by post-deprivation remedies when a deprivation is caused by the random, unauthorized acts of a state employee). The rule in *Parratt* applies to intentional as well as negligent deprivations by state employees. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (due process satisfied by post-deprivation remedy to redress intentional destruction of personal property by prison guard during a "shakedown").

Defendants cite outdated precedent, *Detweiler v. Va. Dep't of Rehab. Serv.*, 705 F.2d 557 (4th Cir. 1983), in support of their assertion that "[t]he State Grievance Procedure, Chapter 30 of Title 2.2 of the Virginia Code, sufficiently assures a terminated employee of due process." As recognized in *Holland v. Rimmer*, 25 F.3d 1251 (4th Cir. 1994), *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985), "held that '[t]he tenured public employee is entitled to oral or written notice of the

---

[6](...continued)

unlawfulness of the defendant's conduct must be obvious. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Plaintiff's complaints of workplace discord are not protected speech under the First Amendment speech; thus, Defendants could not have forecast a construction of her complaints as protected speech.

-22-

charges against him, an explanation of the employer's evidence, and *an opportunity to present his side of the story*.'" *Holland*, 25 F.3d at 1258 (quoting *Loudermill*, 470 U.S. at 546). "Thus, *Loudermill* modified modified this court's holding in *Detweiler* by requiring an opportunity for some kind of a hearing prior to discharge." *Id.* (citations omitted). Defendants further assert that "Plaintiff used the State Grievance Procedure to fight the DMV's decision to terminate her employment," but maintain that other legal proceedings brought by Plaintiff and others "deferred or delayed her opportunity for an administrative due process hearing."

Regarding Plaintiff's due process claim, Defendants' motion to dismiss does not claim that Plaintiff was provided "an opportunity for some kind of a hearing *prior to discharge*," or even *any* hearing prior to discharge. *Holland*, 25 F.3d at 1258 (emphasis added; citations omitted). To be sure, "[w]hen posttermination administrative procedures are afforded, such pretermination procedure functions only as 'an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.'" *Linton v. Frederick County Bd. of Comm'rs*, 964 F.2d 1436, 1439 (4th Cir. 1992) (quoting *Loudermill*, 470 U.S. at 545–46); *see also Holland*, 25 F.3d at 1258. "Such a hearing 'need not be elaborate' and 'need not definitively resolve the propriety of the discharge.'" *Holland*, 25 F.3d at 1258 (quoting *Buschi v. Kirven*, 775 F.2d 1240, 1256 (4th Cir. 1985) (phone call offering an interview sufficient even though not accepted by employees)). "Therefore, a pretermination opportunity to respond, coupled with posttermination administrative procedures provides 'all the process that is due.'" *Id.* (quoting *Loudermill*, 470 U.S. at 547–48). "To require more 'would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.'" *Id.* (quoting *Loudermill*, 470 U.S. at 546).

In this case, however, Defendants' discussion of the post-deprivation due process purportedly

provided to Plaintiff refers to matters outside the pleadings, *e.g.*, "a legal proceeding in the Circuit Court for the City of Richmond," and orders entered in that court; and a legal proceeding in the Circuit Court for the City of Roanoke pursuant to "Chapter 5, Law-Enforcement Officers Procedural Guarantee Act ("LEOPGA") and Virginia Code § 9.1-504 et seq.," and orders entered in that court. And, even if Defendants provided Plaintiff "a pretermination opportunity to respond, coupled with posttermination administrative procedures," and thus provided her "'all the process that is due,'" it is not at all clear to me from Defendants' arguments whether procedural steps taken by either party might have played a role in determining what procedures were or were not provided to Plaintiff (or when, or why not). *Holland*, 25 F.3d at 1258 (quoting *Loudermill*, 470 U.S. at 547–48). Accordingly, the issue must, at the very least, proceed to summary judgment, and I will deny Defendants' motion to the extent that it seeks the dismissal of Plaintiff's due process claims regarding "her attempt to grieve her termination from employment."[7]

---

[7] When ruling on a 12(b)(6) motion, a district court "may consider documents attached to the complaint or the motion to dismiss 'so long as they are integral to the complaint and authentic.'" *Kensington Volunteer Fire Dep't v. Montgomery County*, 684 F.3d 462, 467 (4th Cir. 2012) (quoting *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)). And, "when a plaintiff fails to introduce a pertinent document as part of his complaint, the defendant may attach the document to a motion to dismiss the complaint and the Court may consider the same without converting the motion to one for summary judgment." *Gasner v. County of Dinwiddie*, 162 F.R.D. 280, 282 (E.D. Va. 1995) (citing 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil*, § 1327, at 762–63 (2d ed. 1990). This "encompasses not only documents quoted, relied upon, or incorporated by reference in the complaint, but also official public records pertinent to the plaintiffs' claims." *Id.* (citations omitted); *see also Papasan v. Allain*, 478 U.S. 265, 286 n. 1 (1986) ("Although this case comes to us on a motion to dismiss under Federal Rule of Civil Procedure 12(b), we are not precluded in our review of the complaint from taking notice of items in the public record . . . ."). However, given that Defendants fail to discuss any pretermination procedures afforded to Plaintiff, and that, moreover, the documents presented by Defendants do not paint a clear picture of the post-termination procedures afforded to Plaintiff, I must deny the motion to dismiss. Furthermore, although Plaintiff is represented by counsel, I nonetheless construe the complaint generously, and note that Plaintiff may have raised a separate procedural claim, *i.e.*, not a federal constitutional due process claim, under the LEOPGA, regarding which Defendants state that the "DMV resisted grievance pursuant [to] LEOPGA because of the provisions of [Virginia] Code § 9.1-504, requiring [that] the request for a hearing come 'within a reasonable amount of time.'"

-24-

## VIII.

Count VI alleges "**Supervisory Liability Against Holcomb, Hill, Thorpe and Mitchell**." The paragraphs detailing Count VI are largely conclusory. In the paragraphs regarding the alleged retaliation against Plaintiff for having exercised her First Amendment rights, only Holcomb is mentioned. In the paragraphs regarding Plaintiff's due process claims, only Hill and Holcomb are mentioned. Defendants Thorpe and Mitchell are not alleged to have acted in any way to deprive Plaintiff of a constitutional right, and I have already determined that Plaintiff has failed to state a First Amendment claim. When there has been no constitutional injury, there is no cause of action against a supervisor. *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994).

Regarding Plaintiff's claim of supervisory liability for her due process claims, in *Shaw v. Stroud*, the United States Court of Appeals for the Fourth Circuit observed that it has

> set forth three elements necessary to establish supervisory liability under § 1983: (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw*, 13 F.3d at 799 (citations omitted). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it," *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)), and "there is no respondeat superior liability under § 1983," *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (citing *Monell v. Dept. of Soc. Serv. of City of N.Y.*, 436 U.S. 658, 691 (1978)).

To the extent Plaintiff's due process claims challenge "the interrogation" of Plaintiff

-25-

(regarding the restroom incident with Dawson) by defendants Penny and Howard,[8] the complaint alleges no direct involvement by Holcomb, Hill, Thorpe, or Mitchell, and there are no allegations that Holcomb, Hill, Thorpe, or Mitchell were "on notice of a subordinate's tendency to act outside the law" and thus were "obligated . . . to take steps to prevent such activity." *Randall v. Prince George's County, Md.*, 302 F.3d 188, 203 (4th Cir. 2002).

However, regarding Plaintiff's allegations of pre- and post-deprivations of due process, I have already determined that there are questions surrounding Plaintiff's claims regarding "her attempt to grieve her termination from employment." Accordingly, I will deny the motion to dismiss the count of the complaint alleging supervisory liability against defendants Hill and Holcomb regarding Plaintiff's claim that she was deprived of due process when she was fired.

## IX.

Count VII alleges "**Racial Discrimination Under 42 U.S.C. §§ 1981 and 1983 Against All Defendants**."

"[W]hen suit is brought against a state actor, § 1983 is the 'exclusive federal remedy for violation of the rights guaranteed in § 1981.'" *Dennis v. County of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989)). However, Plaintiff's claims of racial discrimination fail for the same reasons as her national origin claims: there is no content to the claim. There are no allegations of a discriminatory motive, nor any allegations of slurs or disparagements of Russians reported by any of the named defendants.

---

[8] To the extent Plaintiff complains that she was "interrogated" by defendants Penny and Howard "regarding the events that led to the assault and battery charge against Dawson and other complaints about Dawson's behavior in the workplace," Plaintiff has not sufficiently alleged that the "interrogation" deprived her of a property right that would implicate a federal due process claim.

The complaint alleges "repeated interrogations without notice that [Plaintiff] was the subject of anticipatory disciplinary action," but the complaint clearly states that "Defendants also interrogated, or directed the interrogation of other law enforcement officers from the Lynchburg office under the guise of investigating the assault and battery incident involving Dawson and Wootten," and further describes Supinger, one of the individuals who was "interrogated," as "a male, 29-year law enforcement officer and military veteran." In her memorandum in opposition to the motion to dismiss, Plaintiff states that "Dawson's animosity towards Wootten's race (and gender) incited DMV employees to further harass Wootten simply because of her being Russian." These allegations do not show that, because Plaintiff is of Russian origin, she received different treatment than non-Russians. The most generous construction of Plaintiff's claims fail to allege that, but for her race (and it is a stretch to claim that Russians are a race apart),[9] Plaintiff would not have been "interrogated" regarding the restroom incident with Dawson.[10]

## X.

Count VIII alleges a violation of the "**Driver's Privacy Protection Act (18 U.S.C. §§ 2271, et seq.) Against Defendant Hill**." However, as described in the complaint, Hill's disclosure of Plaintiff's DMV information to the Capitol Police is a "permissible use" under the Driver's Privacy

---

[9] At the hearing on the motion to dismiss, Defendants' counsel described Plaintiff's race claim as "a choice by the plaintiff that Russian is suddenly not only national origin, but now it is race." Plaintiff's counsel did not elaborate on the question of race, other than to state once that Dawson's "motivation . . . was based upon, we believe, several things, but certainly race, gender, and national origin played into it," and at another time to state that Plaintiff's Title VII retaliation claim (Count III) relies on "different facts from her own allegations of race, national origin, and gender discrimination."

[10] *See, e.g., supra*, n. 4, and text thereby annotated.

Protection Act ("DPPA").[11]  *See* 18 U.S.C. § 2721(b)(1) & (14); *Maracich v. Spears*, ___ U.S. ___, ___, 133 S. Ct. 2191, 2198-99 (2013); *Reno v. Condon*, 528 U.S. 141, 145 n. 1 (2000).  Accordingly, Plaintiff's DPPA claim must be dismissed.


## XI.

Of the eleven individuals named as defendants in the complaint, there are no allegations of wrongdoing by the following seven: Anderson, Dawson, Gazzola, Howard, Mitchell, Penny, and Winston.  Accordingly, these named defendants must be dismissed from this action.


## XII.

For the stated reasons, I will grant, in part, and deny, in part, Defendants' motion to dismiss.[12] An appropriate order accompanies this memorandum opinion.

Entered this _____23rd_____ day of March, 2015.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

---

[11] The permissible uses set forth in § 2721(b) are not affirmative defenses for which a defendant carries the burden of proof; rather, a plaintiff bears the burden of showing that the obtainment, disclosure, or use of personal information from her motor vehicle records was not for a purpose enumerated in that section.  *See Thomas v. George, Hartz, Lundeen, Fulmer, Johnson, King & Stevens, P.A.*, 525 F.3d 1107, 1111-14 (11th Cir. 2008) ("the statute's structure and language do not suggest a shift of the burden to the defendant").  In this case, however, the complaint explicitly describes a permissible use under the DPPA.

[12] To the extent I have denied the motion regarding claims where Defendants added *pro forma* arguments raising qualified immunity as a defense, *e.g.*,  "[a]lternately, the Court may dismiss any public official from this Count on the basis of qualified immunity," Defendants may renew their motion.

-28-