## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

| | | |
|---|---|---|
| **ANASTASIA V. WOOTTEN,** | ) | |
| *Plaintiff,* | ) | **CASE NO. 6:14-CV-00013** |
| | ) | |
| **v.** | ) | |
| | ) | **OPINION** |
| **COMMONWEALTH OF VIRGINIA,** *et al.,* | ) | |
| | ) | **By: Norman K. Moon** |
| *Defendants.* | ) | **United States District Judge** |

This discrimination and civil rights case is before the Court on cross-motions for summary judgment. Plaintiff Anastasia Wootten seeks summary judgment on her Due Process claim under 42 U.S.C. §1983 against Defendants Richard Holcomb, Joseph Hill, and Jeannie Thorpe because she was not provided adequate process when fired from her job with the Virginia Department of Motor Vehicles ("DMV"). (Dkt. 88). The thrust of her argument is that state law afforded her a choice between two methods of post-termination process. She selected one method (which by law then foreclosed the ability to proceed under the second method) but Defendants refused to proceed in accordance with that selection, with the concomitant result that she has received no post-termination process at all.

Defendants seek summary judgment in their favor on Plaintiff's Due Process claim, her supervisory liability claim, and her claim for retaliatory termination under Title VII. (Dkts. 87 & 131). They argue that Plaintiff was afforded sufficient pre-termination process and failed to take advantage of the hearing opportunities afforded to her. On the retaliation claim, they assert among other things that legitimate, nondiscriminatory reasons existed for Plaintiff's termination. As explained below, Plaintiff's motion will be granted and Defendants' motion will be denied in part and granted in part.

1

## PROCEDURAL HISTORY

Plaintiff instituted this action on April 23, 2014. She alleged numerous claims against several defendants, including for Title VII discrimination based on gender and nationality, as well as various constitutional claims. At the motion to dismiss stage, the Court dismissed several of those claims, but the Due Process and retaliation claims survived. (Dkt. 46). After discovery, the parties filed and briefed the instant cross-motions for summary judgment, on which extensive oral argument was held. (Dkts. 86, 88, 99).

Shortly after oral argument, the Fourth Circuit decided *Hunter v. Town of Mocksville*, 789 F.3d 289 (4th Cir. 2015), a First Amendment case arguably relevant to Plaintiff's case. Accordingly, the Court permitted Plaintiff to file an amended complaint to include her previously-dismissed First Amendment claim. (Dkt. 105). The order also contemplated a revised case schedule with time to perform discovery on the new claim. Plaintiff submitted her amended complaint on July 7, 2015. Three days later, Defendants moved for summary judgment on the First Amendment claim. (Dkt. 110). Magistrate Judge Ballou entered a superseding pretrial order on July 21, 2015 that changed the trial date and extended discovery. (Dkt. 113). The Court then denied without prejudice Defendants' summary judgment motion on the First Amendment claim because it was premature. (Dkts. 124 & 125).

After discovery closed for the second time, Defendants filed a "renewed" motion for summary judgment. (Dkts. 130 & 131). This latest motion "concentrate[s] on the First Amendment issues" and incorporates by reference Defendants' earlier arguments on the Due Process, supervisory liability, and retaliation claims that have already been exhaustively briefed and argued. (Dkt. 131 at 2, 14-15, 24-25). Plaintiff has filed a response which likewise focuses

almost exclusively on the First Amendment claim.[1]  (Dkt. 138).  The upshot of this somewhat halting procedural history is that the Court is now prepared to rule on the Due Process, supervisory liability, and retaliation claims.  A decision on the First Amendment claim will be withheld until after oral argument, which is currently set for January 13, 2016.  (Dkt. 135).

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).  However, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 250.  In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

## FACTS

Plaintiff Anastasia Wootten was employed by the DMV as a Senior Special Agent in its

---

[1]     The "renewed" summary judgment motion and Plaintiff's response present no new facts or arguments that affect the analysis of the Due Process, supervisory liability, or retaliation claims considered in this opinion; hence the Court decides those claims now and withholds decision on the First Amendment claim until after oral argument on that claim.  *See infra* Section IV.

Case 6:14-cv-00013-NKM-RSB   Document 140   Filed 01/07/16   Page 3 of 27   Pageid#: 1865

Lynchburg, Virginia office. Assistant Special Agent in Charge Robert Supinger was her immediate supervisor, who in turn was supervised by Special Agent in Charge David Stultz.

Jennifer Dawson worked at DMV's Lynchburg office in a support capacity during Plaintiff's tenure. Dawson's workplace behavior and Plaintiff's reaction to it was a catalyst of this case, as well as those also filed in this judicial district by Supinger and Stultz. Dawson's behavior included throwing papers, "crying hysterically," and running out of the office. (Dkt. 94-11 at ECF 6-7, 11-12; dkt. 94-12 at 11-12).

Defendant Richard Holcomb is the DMV Commissioner. Defendant Joseph Hill is Assistant Commissioner of the Office of Enforcement and Compliance at DMV. Defendant Jeannie Thorpe is the DMV Human Resources Director. Donald Boswell is the DMV's Director of Law Enforcement Services.

### The Wootten-Dawson Incident

Workplace tension existed between Plaintiff (as well as Supinger and Stultz) and Dawson based on a variety of factors, including Dawson's emotional volatility. (*See*, *e.g.*, dkt. 87-2 ¶ 11; dkt. 87-3 at ECF 8-14; dkt. 87-4 ¶¶ 6-11; dkt. 111-2). After one episode suffered by Dawson, she took approved leave from March 2012 to May 2012 and "was not to return to work until" a physician certified her fitness for duty. (Dkt. 87-4 ¶ 12; dkt. 94-13 at 63). Upon her return, Dawson was assigned office space apart from Plaintiff's area. (Dkt. 87-4 ¶ 12). Also, Defendant Hill and Boswell met with Plaintiff, Supinger, and Stultz and directed them to "act professional and . . . don't get into any confrontation" with Dawson. (Dkt. 87-1 at 111; dkt. 87-4 ¶ 13). As Plaintiff summarized during a later interview with DMV, "we were instructed not to interact with her." (Dkt. 87-5 at 13).

On September 13, 2012, the workplace tension came to head. According to Plaintiff, she

entered the women's bathroom and encountered Dawson, who intentionally pushed Plaintiff. (Dkt. 94-14 at ECF 2-4). Plaintiff appeared before a state magistrate judge the next day (apparently with the support of her direct supervisors, Supinger and Stultz) to swear out a warrant for Dawson's arrest, which was executed shortly thereafter. (*See* dkt. 87-6 at ECF 6-8). Upon learning of the Wootten-Dawson incident, Defendant Hill, Defendant Thorpe, Defendant Holcomb, and Boswell met to discuss who should investigate the matter. (Dkt. 94-11 at 52-53, 55-56; Dkt. 94-13 at 93-94). They selected Director of Field Operations Thomas Penny. (Dkt. 87-2 ¶ 6).

### The Penny Investigation and the Criminal Trial

Penny conducted interviews and authored two executive summaries before the Wootten-Dawson incident went to trial: a short summary on December 7, 2012 to Defendant Hill and a longer summary on December 17, 2012 to Defendant Thorpe. (Dkt. 87-3 at ECF 1-19). The December 7th summary concluded that, at most, Dawson's conduct amounted to mere rudeness and not workplace violence. (*Id*. at ECF 1). Nor did Penny find sufficient evidence to support findings of workplace harassment or that Dawson posed a threat to safety. (*Id*. at ECF 2). Penny also flagged "additional issues" beyond the Wootten-Dawson incident discovered during his investigation, such as "discrepancies in statements" of law enforcement personnel, whether personnel "colluded in unfairly prosecuting [Dawson] for reasons" other than the belief she committed a crime, and whether information about Plaintiff's effort to secure a warrant against Dawson was "purposely withheld" from DMV headquarters "to prevent intervention in her arrest." (*Id*.).

Penny's December 17th summary addressed the same topics with greater factual detail and reached the same conclusions. (*Id*. at ECF 4-18). Penny closed both summaries by asking to

Case 6:14-cv-00013-NKM-RSB   Document 140   Filed 01/07/16   Page 5 of 27   Pageid#: 1867

be present at the state court trial of the assault and battery case in order to assess whether the witnesses testified in a manner consistent with their interviews. The assault and battery case proceeded to a bench trial on January 29, 2013. (Dkt. 87-7). After hearing the evidence, Judge Black of the Lynchburg General District Court ruled "I don't think any touching that took place in that restroom rises to the level of a criminal assault and battery. I'm going to find [Dawson] not guilty." (*Id*. at 76).

### Wootten's Involvement in Supinger's Situation

On March 16, 2012 (*i.e.*, before the Wootten-Dawson incident), Boswell travelled to Lynchburg to announce that Supinger was being transferred to Waynesboro, Virginia, as ordered by Defendant Holcomb. (Dkt. 94-11 at 173; dkt. 94-13 at 17-18). Holcomb claimed the transfer was based on DMV's anti-nepotism policy (Supinger and his wife worked in the same building) and "a need for leadership" in that part of the district caused by the transfer of another employee. (Dtks. 94-16 & 94-17; *see* dkt. 94-11 at 165-66). Plaintiff viewed the transfer as unfair because she knew of other employees "working under the same condition" to whom the nepotism policy was not applied. (Dkt. 94-14 at ECF 7-9). Supinger filed an EEOC charge of discrimination stemming from his transfer and other events, such as his belief he was discriminated against due to his wife's nationality.[2] (Dkt. 94-13 at 36-38; dkt. 94-19 at 6). Plaintiff—as a "witness" in Supinger's grievance—expressed her opposition to Supinger's treatment to Deputy Commissioner David Mitchell. (*See* dkt. 94-19 at 6; dkt. 94 at 10-11).

Defendant Thorpe was aware of Plaintiff's role as a "person with information" in Supinger's grievance before Plaintiff, as described below, was terminated on April 3, 2013. (Dkt 94-13 at 38). Shortly thereafter, on April 9, 2013, Plaintiff submitted her own EEOC charge of

---

[2] The Court takes judicial notice of the fact that Supinger eventually filed a Title VII lawsuit for race discrimination, gender discrimination, and retaliation. *Supinger v. Commonwealth of Virginia et al.*, No. 6:15-cv-17-NKM-RSB (W.D. Va. July 8, 2015).

retaliation "for being a witness in a coworker's discrimination complaints" and for filing the assault and battery charge against Dawson. (Dkt. 94-20).

### Fallout from the Wootten-Dawson Incident

On March 6, 2013, Defendant Hill suspended Plaintiff in a lengthy letter.[3] Hill wrote that it appeared Plaintiff "may have intentionally abused and recklessly used [her] police powers to arrest—under color of DMV authority—a coworker for assault and battery under questionable circumstances, which ultimately led to acquittal." (Dkt. 89-2 at 1; *see id*. at 2-3 (recounting questionable circumstances)). Additionally, Hill cited Plaintiff for failing to obey the order by Boswell not to interact with Dawson. (*Id*. at 2). Plaintiff was placed on "pre-disciplinary leave until a determination is made in this matter." (*Id*. at 3). Hill relayed that Plaintiff had a right to respond to the allegations, that her response was due on March 13, 2013, and that it "should specify whether you are electing to proceed under Commonwealth of Virginia Grievance Procedure [Va. Code §§ 2.2-3000 *et seq*.] or the Law-Enforcement Officers Procedural Guarantee Act," Va. Code §§ 9.1-500 *et seq*. (*Id*.; dkt. 87-8). These statutes are referred to herein as the VGP and LEOPGA, respectively.

On March 13, 2013, Plaintiff's counsel responded by, *inter alia*, denying the allegations. (Dkt. 89-3 at 2-3; dkt. 87-9). The letter closed by observing that Plaintiff "wishes to pursue this matter under" the VGP. (Dkt. 89-2 at 3). On March 21st, Plaintiff filed her grievance form under the VGP regarding her suspension. (Dkt. 89-4 at 1; dkt. 89-1 ¶ 8). At that time, Plaintiff had not been terminated.[4] But on April 5, 2013, Defendant Hill (citing both the alleged failure to

---

[3]    The suspension letter was a joint effort of Defendants Hill, Thorpe, and Holcomb, among others. (Dkt. 94-13 at 42-44).

[4]    Plaintiff also filed an EEOC intake questionnaire on March 22, 2013, alleging national origin and gender discrimination, but not retaliation. (Dkt. 87-10 at ECF 25, 29).

7

obey orders to avoid Dawson and the circumstances surrounding the Dawson incident) terminated Plaintiff.[5]  (Dkt. 89-5 at 1-2; dkt. 89-6 at 1; dkt. 94-22; dkt. 94-23).  Defendant Holcomb reviewed and approved of the termination.  (Dkt. 94-13 at 39, 45; dkt. 98-1 at 91).

### Procedural Wrangling

On April 17, 2013, twelve days after her termination, Plaintiff—along with Supinger and Stultz—petitioned the City of Richmond Circuit Court to enjoin the Virginia Attorney General's appointment of a special outside counsel (Karen Michael) to represent DMV in the administrative proceedings involving Plaintiff's (as well as Supinger's and Stultz') suspension grievance under the VGP.  (Dkt. 89-7 ¶¶ 6, 14, 17).  On April 26, 2013, outside counsel Michael asked the Department of Employment Dispute Resolution ("EDR")—*i.e.*, the department that administers the VGP—for an order "to stay all proceedings as it relates to any current, pending and/or future grievances" filed by Plaintiff, in light of her Petition and until it was resolved.  (Dkt. 89-8).  Outside counsel Michael's letter on behalf of DMV acknowledged that Plaintiff had a pending grievance but alluded to the fact that a separate grievance stemming from her April 5th termination could be forthcoming.  (*Id.*).  Plaintiff likewise asked for clarification about whether the deadline to file any termination grievance would be stayed.  (Dkt. 87-9 at ECF 46).

EDR responded on May 1, 2013.  (Dkt. 89-9).  EDR first expressed some hesitation at granting a *carte blanche* stay of the VGP proceedings and observed that it "is only aware of the status of a singled active grievance involving" Plaintiff, *i.e.*, her suspension grievance, "which is currently the subjection of a pending compliance ruling request at EDR.  EDR will not stay that [compliance ruling] at this time."  (*Id.*).  But EDR ultimately concluded that DMV and Plaintiff had "effectively agreed" on an extension.

---

[5]     The investigation by Penny was a lynchpin of Plaintiff's termination.  (Dkt. 87-1 at 144).

> Therefore, while [Wootten] is not prevented from filing a grievance now, [s]he may do so after the disposition of the recently filed action in the Richmond City Circuit Court. The filing timeframe will be considered tolled during the pendency of the action.

(*Id.*) In other words, EDR stayed the suspension grievance before it and tolled the time to file a termination grievance; Plaintiff could—but need not—have submitted her termination grievance to EDR during that time, *if* she wished to proceed under the VGP. EDR confirmed this position in a May 3, 2013 letter. (Dkt. 89-10). Likewise, the Richmond Circuit Court stayed *any* termination grievance proceeding in both oral and written orders in June 2013 until it adjudicated the Petition to remove DMV's outside counsel. (Dkts. 89-11, 89-12).

This status quo changed on October 21, 2013, when the Richmond Circuit Court dismissed the Petition with prejudice, effectively dissolving its stay of any action regarding a termination grievance. (Dkt. 89-13). Four days later, Plaintiff requested a termination grievance hearing *for the first time*, and did so under LEOPGA by letter to Defendant Holcomb. (Dkt. 89-14).

### DMV's Letter of October 29, 2013 and Resulting Logjam

DMV responded through counsel on October 29, 2013, in a letter reviewed and approved by Defendants Thorpe, Hill, and Holcomb. (Dkt. 89-15). The letter "considered" Plaintiff's request to proceed under LEOPGA but refused it because "the Commissioner [Defendant Holcomb] has determined that Ms. Wootten may not proceed as requested." (Dkt. 89-15).

First, quoting LEOPGA § 502(B), DMV wrote that Plaintiff could proceed under *either* LEOPGA *or* the VGP, "but not both." But, DMV contended, Plaintiff "already elected to proceed under" the VGP, and thus LEOPGA was foreclosed. DMV's letter, however, ignored the fact that Plaintiff's March 21, 2013 grievance form electing the VGP related to her *suspension*, not her termination. Indeed, EDR's Grievance Procedure Manual states that after a

9

"grievance is initiated, challenges to additional management actions or omissions cannot be added. To challenge a new management action or omission after the initiation of a grievance, an employee *would need to file a new grievance*." (Dkt. 89-16 at 7, § 2.5 & n.2).[6] Moreover, to properly file a dismissal grievance under the VGP procedures, the grievant must submit to EDR "a fully completed Grievance Form A – Dismissal Grievance." (Dkt. 89-16 at 9, § 2.5; dkt. 89-17). Plaintiff, of course, filed a suspension grievance with EDR (dkt. 89-4), but not a termination grievance with it.[7] (Dkt. 89-1 ¶ 14).

Second, DMV claimed Plaintiff's October 21st LEOPGA election was untimely under § 504(A)—which requires requesting a hearing "within a reasonable amount of time" after dismissal—because, in DMV's view a "period in excess of six months" was not reasonable. This contention disregarded the prior stay on any termination grievance proceedings instituted by the Richmond Circuit Court (and the stay EDR issued that in turn relied upon the parties' agreement for a stay). Plaintiff's counsel raised all of these responsive points in a November 4, 2013 letter to DMV and Defendant Holcomb. (Dkt. 89-19). The letter reiterated Plaintiff's demand for a hearing under LEOPGA.

**The Commonwealth Doubles (and Triples) Down on Refusing a LEOPGA Hearing**

DMV responded on November 11, 2013. (Dkt. 89-20). It again cited Plaintiff's March 13, 2013 letter as proof Plaintiff "specifically elected the 'Commonwealth of Virginia Grievance Procedure,'" a contention that once more obscured the fact that that letter pertained to Plaintiff's

---

[6]     The Manual illustrates these principles in a hypothetical (and analogous) situation of a grievance filed over a transfer, followed by the grievant's termination, which would require a separate, second grievance challenging the termination "if [the grievant] intends to challenge it."

[7]     Plaintiff, on July 18, 2013 in the Richmond Circuit Court case, did file a brief which mentioned in passing her future intent to file a termination grievance under the EDR procedure. (Dkt. 87-10 at ECF 8-9).

suspension, not to her then-nonexistent termination.  DMV (through counsel, *i.e.*, Ms. Michael, the very attorney whose appointment to DMV was challenged in the Richmond Circuit Court case) also asserted that, because it was not a party to the Richmond Circuit Court case, it "is not aware of any order issued and/or binding on the agency staying the [LEOPGA] process." Plaintiff replied on November 15th, arguing that both contentions were made in bad faith and demanding "for the third time" a LEOPGA hearing.  (Dkt. 89-21).[8]  DMV responded in kind on November 20th, reiterating that it would not grant a LEOPGA hearing and would not respond to further letters.  (Dkt. 89-22).

On May 2, 2014 (after the Virginia Supreme Court finally disposed of Plaintiff's appeal from the Richmond Circuit Court ruling), DMV continued to insist that EDR hear Plaintiff's termination grievance.  (Dkt.  89-24).  In seeming contradiction with DMV's earlier positions, the May 2nd letter (1) indicated DMV was aware of the stay issued by the Richmond Circuit Court, (2) suggested the stay had bearing upon the timeliness of any termination grievance, and (3) acknowledged Plaintiff had not yet filed a termination grievance with EDR.

> [The Virginia Supreme Court's decision means] all issues raised by [Plaintiff] in the Richmond City Circuit Court case regarding the representation of the [DMV] in [Plaintiff's] grievances have been disposed of.
>
> [DMV] requests that EDR immediately lift the stay on all dismissal grievances, and order that [Plaintiff is] permitted that amount of time to file [her] dismissal grievance[] that [she] had as of the date the stay was first implemented.

On May 6, 2014, EDR denied DMV's request, observing (in line with Plaintiff's view) that Plaintiff had elected to grieve her termination under LEOPGA, which meant she was "no longer able to pursue a dismissal grievance under the" VGP.  (Dkt. 89-18).  "This would appear to

---

[8]      While the Richmond Circuit Court's ruling was on appeal, EDR notified the parties on November 19, 2013 that its previously imposed *status quo* would remain, *i.e.*, that "the potential filing of the termination grievances" would be stayed and tolled, although Plaintiff remained free to file if she wished.  (Dkt. 87-10 at ECF 16).

conclude EDR's involvement in this matter." (*Id.*)

# ANALYSIS

## I. Procedural Due Process Claim

In Count V, Plaintiff sues Defendant Holcomb in his official and individual capacities, as well as Defendants Hill and Thorpe in their individual capacities for violating the Due Process Clause. (Dkt. 109 ¶¶ 9-10, 12, 119-28).[9] Defendants concede that Plaintiff had a property interest in her continued state employment. (Dkt. 95 at 10).[10] In dispute is whether Defendants provided Plaintiff a constitutionally sufficient amount of process.

To properly understand the Due Process claim, a review of Virginia's grievance procedures is necessary. As discussed above, there are two methods at play here. One is the Commonwealth of Virginia's Grievance Procedure ("VGP"), Va. Code. 2.2-3000 *et seq*. By law, "all nonprobationary state employees"—which Plaintiff was—"shall be covered" by the VGP. § 3001(A). Grievances under the VGP involving dismissals "proceed directly to a formal hearing." § 3003(A). Importantly, § 3002(3) contains an opt-out clause providing that, if a law enforcement officer—which Plaintiff was—has a grievance covered by another statutory scheme and elects to resolve her grievance under that scheme, the VGP "shall not apply."

This other, second statutory scheme is the Law-Enforcement Officers Procedural Guarantee Act ("LEOPGA"), Va. Code 9.1-500 *et seq*. LEOPGA allows an aggrieved law enforcement officer to, "within a reasonable amount of time," request a hearing regarding the

---

[9]    The initial complaint originally proceeded against all Defendants, but Plaintiff winnowed down the claim in her amended complaint.

[10]    Plaintiff argues that she was also entitled to a name clearing hearing. (Dkt. 94 at ECF 28). But Plaintiff has not marshaled any substantive argument or analysis showing why a reputational liberty interest is at stake or that such an interest was deprived without process, *see Sciolino v. City of Newport News*, 480 F.3d 642, 646 (4th Cir. 2007) (describing elements), and the theory was not included in the complaints. *See* dkt. 1 ¶ 150; dkt. 109 ¶ 123.

aggrieved action, including termination.  § 504(A).  If so requested, the hearing generally must be held within fourteen days.  (*Id.*).  The hearing includes the presentation of evidence and witnesses.  (*Id.*). The hearing panel makes written, advisory recommendations to the agency's chief executive officer, who must give them "significant weight."  § 504(D).  Consistent with § 3002(3) of the VGP, LEOPGA makes clear that a grievant may choose to proceed under LEOPGA or an alternate grievance procedure, "but not both."  § 502(B).[11]

The Court emphasizes that whether Defendants violated state law in their handling of Plaintiff's termination grievance is not itself the *sine qua non* of Plaintiff's Due Process claim.[12] As the Fourth Circuit has observed, "a state does not *necessarily* violate the Constitution every time it violates one of its rules," *Riccio v. County of Fairfax*, 907 F.2d 1459, 1466 (4th Cir. 1990) (emphasis added), and "the mere fact that a state agency violates its own procedures does not *ipso facto* mean that it has contravened federal due process requirements." *Garraghty v. Com. of Va., Dep't of Corr.*, 52 F.3d 1274, 1285 (4th Cir. 1995).  The point is easily shown by hypothetically tweaking the facts of this case.  Suppose that, *prior* to Plaintiff's October 25, 2013 letter requesting a LEOPGA hearing regarding her termination (and thus when both LEOPGA and the VGP remained available), Defendants preemptively informed Plaintiff they would not honor any election to proceed under LEOPGA and would only move forward under the VGP. This would be a violation of state law, *i.e.*, of Plaintiff's right to choose between the two methods granted by LEOPGA § 502(B) and VGP § 3002(3).  But Plaintiff would still have a

_____

[11]     Defendants observe—and Plaintiff does not dispute—that, although the literal text of LEOPGA § 502(B) refers to a "local governing body's grievance procedure" as the alternative to LEOPGA, the Commonwealth in practice applies this language to elections for process through state agencies under the VGP.

[12]     The parties at times recognize this point.  (Dkt. 87 at 18; dkt. 89 at 13; dkt. 94 at ECF 29 & n.26).

Case 6:14-cv-00013-NKM-RSB   Document 140   Filed 01/07/16   Page 13 of 27   Pageid#: 1875

constitutionally sufficient process at her disposal through the VGP, and the failure to avail herself of it would defeat the Due Process claim.  *See infra*.

Yet as *Riccio* and *Garraghty* themselves clearly allow, violations of state law can transgress the Due Process Clause where their end result is constitutionally deficient process. That is the situation here.  Unlike the hypothetical above, Defendants refused to hear Plaintiff's termination grievance under LEOPGA only *after* Plaintiff elected that procedure.  By that time, the other avenue of constitutionally sufficient process—the VGP—was foreclosed, a fact confirmed by both statutes and EDR's letter of May 6, 2014.  (Dkt. 89-18.)  In other words, Defendants refused to provide Plaintiff with the only process available to her.  Defendants attempt to avoid the conclusion that they violated Plaintiff's right to due process, but none of their arguments are persuasive.

### A.    More than Pre-Termination Process Was Required

Defendants—citing *Holland v. Rimmer*, 25 F.3d 1251 (4th Cir. 1994)—assert that they need only have given Plaintiff a pre-termination opportunity to respond to the charges against her, which they did.  (Dkt. 87 at 14-15, 18).  But *Holland* does not so hold.  Rather, it found no Due Process violation where the employer provided plaintiff "with a pretermination opportunity to respond *and complied with the Virginia grievance procedures*, [thus] giving him notice *and a posttermination hearing*."  *Id.* at 1259 (emphasis added); *see also Garraghty*, 52 F.3d at 1293 (observing that examination of witnesses is required post-termination if not afforded pre-termination, even when underlying facts are undisputed).

Supreme Court and Fourth Circuit precedent instruct that post-termination process is required to satisfy the Due Process Clause.  A public employee is "entitled to a very limited hearing prior to his termination, *to be followed by a more comprehensive post-termination*

14

hearing." *Gilbert v. Homar*, 520 U.S. 924, 929 (1997) (emphasis added); *Copenny v. City of Hopewell*, 7 F. Supp. 3d 635, 638 (E.D. Va. 2014). *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985) "and its progeny have upheld pre-termination process . . . *only when a plaintiff was later afforded a full post-termination hearing*." *Garraghty*, 52 F.3d at 1283 (citing *Holland* and two other Fourth Circuit cases). And "at some point, a delay in the post-termination hearing would become a constitutional violation." *Loudermill*, 470 U.S. at 547. Here, the undisputed facts show that Defendants refused to provide Plaintiff with post-termination process, despite her repeated requests (on October 25th, as well as November 4th and 15th, of 2013) for it under LEOPGA.

## B. Plaintiff Adequately Availed Herself of Post-Termination Remedies

Defendants summarize a handful of nonbinding cases that conclude a plaintiff cannot forego available administrative remedies and then assert a violation of due process. (Dkt. 87 at 15-17). They write:

> "[A] procedural due process violation cannot have occurred when the government actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies." *Alvin v. Suzuki*, 227 F.3d 107, 126 (3d Cir. 2000) (citing *Zinermon v. Burch*, 494 U.S. 113, 126 (1990)). This is precisely what happened in this matter.

(*Id*. at 18). The Court acknowledges that Defendants' authorities show that plaintiffs must take advantage of available state procedures before asserting a Due Process claim. The problem with Defendants' position, however, is that they do not provide an intelligible or factually-substantiated explanation of why or how that principle applies to this case.

For instance, Defendants fault Plaintiff for "delaying" a possible hearing of her termination grievance. When "the Richmond Circuit Court lifted the stay on [the] termination grievance," they say, Plaintiff "hesitated." (Dkt. 87 at 18). But Plaintiff filed her termination

15

grievance under LEOPGA only *four days* after the Richmond state court lifted its stay on October 21, 2013. (Dkts. 89-13 & 89-14).[13]

More centrally—although not fleshed out in detail—Defendants contend that their "offers" for Plaintiff to go forward with her termination grievance under the VGP was an "opportunity" for constitutionally sufficient process that she bypassed by electing a LEOPGA hearing. They apparently believe this even though (1) any proceedings on a termination grievance were stayed until October 21, 2013, (2) state law afforded Plaintiff the ability to grieve her termination through either the VGP or LEOPGA, and (3) her selection of LEOPGA meant the VGP was foreclosed. They argue:

> As late as November 20, 2013, DMV offered [Plaintiff] the opportunity to use the [VGP]. Yet [she] *declined*. . . . The federal constitutional question remains centered on [Plaintiff's] ability to use any valid or fair procedure for hearing of her grievance. DMV's offer to start the termination grievance in September and through November 19, and 20, 2013—upon expiration of the Richmond Circuit Court's stay—was an opportunity. [Plaintiff] *declined*.

(Dkt. 87 at 18, 19 (emphasis added)). But far from failing to "take[] advantage of the processes that are available," *Root v. Cty. of Fairfax*, 371 F. App'x 432, 434 (4th Cir. 2010); *Ashley v. N.L.R.B.*, 255 F. App'x 707, 710 (4th Cir. 2007); *Baker v. McCall*, 842 F. Supp. 2d 938, 944 (W.D. Va. 2012), Plaintiff made every effort to participate in Virginia's two-track system for grieving terminations: She repeatedly elected—as the Virginia General Assembly granted her the right to do—for a hearing under LEOPGA. (Dkts. 89-14, 89-19, 89-21). Defendants refused to give it to her. (*E.g.*, dkts. 89-15, 89-20, 89-22).

Defendants' tacit premise—that Plaintiff was required to elect the VGP, and her decision

---

[13]     As explained above, there are specific procedures for submitting a termination grievance, thus undermining Defendants' subtle contention that Plaintiff's statement in a July 18, 2013 brief before the Richmond Circuit Court somehow constituted an election for process under the VGP. (*See* dkt. 87 at 9-10).

not to was forfeiture—is unexplained and incorrect, *see* LEOPGA § 502(B); VGP § 3002(3), a point made even clearer by EDR, the agency that administers the VGP. That body wrote to DMV that Plaintiff's LEOPGA election meant she "is no longer able to pursue a dismissal grievance under" the VGP and accordingly refused to take jurisdiction over the matter. (Dkt. 89-18). Thus, even on Defendants' (albeit incorrect) view that there existed a valid and otherwise binding offer to proceed under VGP, the rule from *Root* and *Ashley* would not apply because "those processes [were] unavailable." *Root*, 371 F. App'x at 434; *Ashley*, 255 F. App'x at 710.[14]

Alternatively, the thrust of Defendants' position would lead to the untenable result that there can never be a due process violation in Virginia arising out of an officer's termination. Under their reasoning, an "opportunity" for process always exists because Virginia law affords grievants a choice between two constitutionally adequate alternatives. But when a grievant exercises that choice, he necessarily "declines" an available and adequate process, thus barring the claim—even when (like here) there has been a refusal to honor the choice and provide any post-termination process. Such Kafkaesque logic cannot survive the Fourteenth Amendment, because "due process is flexible and calls for such procedural protections as the particular situation demands." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997). The Due Process Clause protects the right *to actually receive* process if Plaintiff follows administrative remedies, not the illusory "opportunity" to request process that will never be given.

---

[14] Defendants, casting themselves as "blameless," use the May 6th EDR letter to shift blame for the Due Process violation onto EDR's Director. (Dkt. 87 at 19). Plaintiff, they write, "was not deprived of constitutional due process by individual defendants." (*Id*.) The contention is curious.

That EDR *followed* state law by declining jurisdiction does not absolve Defendants of their actions. It was *Defendants* who were responsible for giving Plaintiff due process and failed to do so by obstinately refusing to honor Plaintiff's election and provide a hearing, as state law instructed and the Constitution required. In a two-track system of process where the first track is correctly foreclosed and the second track is wrongly denied, the second track's conductor is at fault for the constitutional deprivation.

17

## C. Qualified Immunity Does Not Apply

Defendants assert that they are entitled to qualified immunity.  (Dkt. 87 at 20).  This defense to claims of money damages for constitutional violations applies unless the right violated "was 'clearly established' at the time of the challenged conduct."  *Covey v. Assessor of Ohio Cty.*, 777 F.3d 186, 195-96 (4th Cir. 2015) (holding qualified immunity did not apply when defendant claims to be "unaware of [a] basic rule, well established by our cases").  "The burden of proof and persuasion with respect to a defense of qualified immunity rests on the official asserting that defense."  *Meyers v. Baltimore Cty., Md.*, 713 F.3d 723, 731 (4th Cir. 2013).

Defendants have not met their burden.  They summarily argue that:

> The Fourth Circuit decisions in *Riccio* and *Holland v. Rimmer* leave the reasonable public official understanding *that LEOPGA rights are not constitutionally mandated*.  Those cases instruct that affording the terminated employee an opportunity for a hearing under the [VGP]—*which she ultimately refused*—was sufficient to meet DMV's Fourteenth Amendment obligations.

(Dkt. 87 at 20 (emphasis added); *see also* dkt. 95 at 9).  This obscures the right at stake, the context in which it was violated, and the record.  As explained *supra*, the issue is not and has never been whether there is a *per se* constitutional right to LEOPGA (or any particular statute), or whether a violation of state law is automatically a violation of due process.  Rather, the issue is simple:  Whether repeatedly refusing to give any post-termination process to a state employee violates due process.  The property right at issue was Plaintiff's employment.  She was terminated.  State law told her to grieve her termination in one of two ways, but not both.  She did so.  Defendants then refused to provide her with any post-termination process.

To begin, at least two U.S. Supreme Court cases have made clear that due process requires that a terminated public employee be given a "comprehensive post-termination hearing," *even if*—as here—some pre-termination process existed.  *Gilbert v. Homar*, 520 U.S. 924, 929

18

(1997) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985)). Moreover, at least four Fourth Circuit cases have similarly held that post-deprivation process is needed. *Garraghty*, 52 F.3d at 1283 (citing *Holland v. Rimmer,* 25 F.3d 1251, 1258 (4th Cir. 1994); *Linton v. Frederick County Bd. of County Com'rs.,* 964 F.2d 1436, 1441 (4th Cir. 1992); *McClelland v. Massinga,* 786 F.2d 1205, 1213 (4th Cir. 1986)). One of those cases was *Holland*, which undermines rather than supports Defendants' qualified immunity argument because it held that providing a post-termination hearing was required to avoid a due process violation. And *Garraghty*, over twenty years ago, *denied* qualified immunity on a Due Process claim because those defendants, like Defendants here, could not "have reasonably believed that they provided [plaintiff] with constitutionally sufficient due process, even though they never—before or after terminating him—afforded him the opportunity to confront and examine any witness." 52 F.3d at 1282-84. All of these cases set forth a "basic rule, well established from our cases," *Covey*, 777 F.3d at 195-96, that a reasonable official would have understood the refusal to afford an employee any post-termination process violated the Constitution.

Defendants fair no better under *Riccio v. County of Fairfax*, 907 F.2d 1459 (4th Cir. 1990). That case instructs that "a state does not *necessarily* violate the Constitution every time it violates one of its rules"; "violations of state rules are not *necessarily* violations of the Due Process Clause even where those rules regulate the deprivation of a property or liberty interest whose existence is established," and; violating LEOPGA "does not *necessarily* compel a finding of a due process violation." *Id*. at 1466, 1468 (emphasis added). The Fourth Circuit's repeated use of "necessarily" clearly allows that violations of state law can violate due process where the constitutional minimum is ultimately lacking, as here. At most, *Riccio* stands for the proposition that state actors may violate state "laws or procedural rules creating rights *beyond* those

19

guaranteed by the Constitution," *Hodge v. Jones*, 31 F.3d 157, 168 (4th Cir. 1994) (citing *Riccio*, 907 at 1466) (emphasis added), but only insofar as they do not dip below the minimum amount of process required by the Constitution. *Riccio* does not excuse the refusal to provide any process whatsoever or otherwise provide a reasonable basis to depart from the well-settled principles supplied by *Gilbert*, *Garraghty*, and the like.[15]

Even if the foregoing authorities were insufficient, the Fourth Circuit has "repeatedly" held that:

> it is not required that a right violated already have been recognized by a court in a specific context before such right may be held 'clearly established' for purposes of qualified immunity. Thus, the absence of a judicial decision holding [that due process is violated] under similar circumstances does not prevent a court from denying a qualified immunity defense. As the Supreme Court has emphasized, officials can still be on notice that their conduct violates established law even in novel factual circumstances.

*Meyers v. Baltimore Cty., Md.*, 713 F.3d 723, 734 (4th Cir. 2013) (internal citations and quotations omitted); *e.g., Tobey v. Jones*, 706 F.3d 379, 392-93 & n.6 (4th Cir. 2013). Accordingly, qualified immunity on the Due Process claim is lacking.

## II. Supervisory Liability

Defendants argue against the supervisory liability claim in Count VI by relying only on their analysis of the substantive claim:

> In the absence of a constitutional injury, there is no cause of action against a supervisor of Wootten. *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994). . . . Defendants Hill and Holcomb rest their supervisory liability defense on the argument just made on Due Process.

---

[15] Additionally, the Court finds that the defendants' litigating positions in *Garraghty*, 52 F.3d at 1281-82, are somewhat akin to this case. In their briefs and especially in their letters to Plaintiff in the fall of 2013, Defendants made several assertions, often in *ipse dixit* form, that either ignored relevant facts or pertinent statutory language, contradicted prior assertions, or parried by focusing on peripheral issues. The Court reads *Garraghty* at page 1282 to suggest that qualified immunity does not shield an official based on idiosyncratic, unreasoned, or obtuse interpretations of the law.

(Dkt. 87 at 20). Because the Court has found a substantive violation, Defendants' motion on that Count will be denied and Plaintiff's motion will be granted.[16]

## III.     Retaliation Claim

Count III is Plaintiff's claim for retaliation under Title VII against the Commonwealth and DMV. (Dkt. 1 at 23-25; dkt. 109 at 17-19). The heart of this claim is that Plaintiff was fired for supporting her co-worker Supinger and for participating as a witness in his grievance. The parties proceed under the *McDonnell Douglas* framework, and the Court will follow suit.

> The *McDonnell Douglas* framework is a three-step burden-shifting framework used by Title VII plaintiffs who lack direct evidence of retaliatory discrimination. To prevail under the *McDonnell Douglas* framework, [plaintiff] must first establish a *prima facie* case by showing: (i) that [she] engaged in protected activity, (ii) that [her employer] took adverse action against [her], and (iii) that a causal relationship existed between the protected activity and the adverse employment activity. The burden then shifts to the [defendant-employer] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason. If the employer makes this showing, the burden shifts back to the plaintiff to rebut the [defendant-employer's] evidence by demonstrating that the employer's purported nonretaliatory reasons were not its true reasons, but were a pretext for discrimination.

*Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015) (internal quotations and citations omitted). The "burden for establishing causation at the *prima facie* stage is 'less onerous'" than the causation test at the third step ("pretext") of the analysis. *Id.* at 251. At the pretext stage, "a plaintiff must establish both that the employer's reason was false and that retaliation was the real reason for the challenged conduct," which is effectively a "but-for" standard. *Id.* at 252.

The Court assumes that the first two elements of Plaintiff's *prima facie* case are

---

[16]     A trial will still be needed on Counts V and VI to determine the amount of damages, and briefing will occur at a future point on what prospective remedies, if any, are available and appropriate.

21

satisfied.[17]  Defendants' assert, *inter alia*, that there were "legitimate business reasons" for Plaintiff's termination that show an "absence of nexus" (dkt. 87 at 25; *see id.* at 26-28), an argument which seemingly conflates the last prong of the first *McDonnell Douglas* step ("causal relationship") with the third step (pretext).  The Court has set forth the correct standards for these separate but related inquires above.  Defendants contend that evidence on a "causal relationship" between the protected activity and Plaintiff's termination is lacking because Defendant Hill, who formally terminated Plaintiff, was only "vaguely aware" of Plaintiff's participation in the Supinger grievance.  (Dkt. 87 at 25).  While the Court agrees that the evidence on this element is thin, it again assumes that this element is satisfied and that Plaintiff has made out a *prima facie* case.  (*See* dkt. 94 at 10-12).

Defendants have several legitimate, nondiscriminatory reasons for Plaintiff's termination. The April 5, 2013 termination notices from Defendant Hill put forth the following justifications for the firing:  (1) violating a direct order from superiors to avoid contact with Dawson; (2) lack of credibility stemming from her portrayal of the Dawson incident, and relatedly; (3) abuse of authority by failing "to remain impartial as a sworn officer" and improperly injecting "personal motives" into her duties as an officer (*i.e.*, swearing out a warrant against Dawson under dubious circumstances).  (Dkts. 94-22, 94-23; *see* dkt. 89-2).  In evaluating whether Plaintiff can show that these reasons were pretextual, the Court is not called upon to judge "whether the reason was wise, fair, or even correct, ultimately."  *Dugan v. Albemarle Cty. Sch. Bd.*, 293 F.3d 716, 722 (4th Cir. 2002).  If the record shows Defendants "honestly believed" Plaintiff deserved to be

---

[17]     For example, Plaintiff asserts that "no doubt exists that [Plaintiff] engaged in protected activity" by serving as a witness in support of Supinger's EEOC grievance and by opposing alleged discrimination against him on account of his interracial marriage.  (Dkt. 94 at 39).  This appears to fall within the definition of protected activity.  *E.g.*, *Glover v. S. Carolina Law Enf't Div.*, 170 F.3d 411, 413 (4th Cir. 1999); *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 174-75 (2d Cir. 2005).

discharged, then pretext is absent, even if Defendants were wrong or mistaken about the underlying facts. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 217-18 (4th Cir. 2007).

Worth noting at the outset is the time and effort invested in examining the incident with Dawson on September 13, 2012. Thomas Penny conducted a lengthy investigation that included numerous witness interviews and culminated in his December 2012 reports to Defendants Hill and Thorpe. (*See* dkt. 131 at 8-9 (summarizing Penny investigation)). Plaintiff, of course, presented her side of the story to a state magistrate on September 14, 2012. And the matter was given a full trial on the merits in state court, which culminated in a not guilty verdict for Dawson on January 29, 2013. All of this information was at Defendants' disposal at the time Plaintiff was terminated, a critical point since it "is the perception of the decisionmaker which is relevant." *Holland*, 487 F.3d at 217.

### A. Lack of Credibility and Abuse of Authority

Defendant Hill cited Plaintiff's inconsistent statements about the nature of the physical contact with Dawson—*i.e.*, at first calling it forcible, "full body contact" only to later describe it as "not violent at all." Going further, the termination notice also explained that the "totality of circumstances" demonstrated that Plaintiff abused her authority by injecting personal motives against Dawson into the situation, leading her to "falsely describ[e]," "misrepresent[]," or "exaggerate[e]" the incident in order to have Dawson arrested. (Dkt. 94-23). This conclusion found support in the statements of the magistrate judge who granted the arrest warrant for Dawson. In correspondence with Penny during his investigation, the magistrate recounted that (1) upon questioning, Plaintiff identified Dawson as "co-worker" who "had been causing a lot of trouble at work"; (2) the magistrate "was skeptical" about the need to have Dawson arrested rather than turn herself in, but Plaintiff "stated under oath that [Dawson] is dangerous and has

lots of guns," and; (3) she viewed "the complaint [as] extremely petty" but had no discretion to deny the warrant because Plaintiff, "an officer, stated under oath that Ms. Dawson bumped her intentionally and forcefully." (Dkt. 87-6 at ECF 1-2).[18] Defendants, of course, also had the benefit of the state court's not guilty verdict against Dawson.

Critically, Plaintiff's termination notices relied on interviews and statements (like those highlighted above) made during the Penny investigation. Plaintiff admitted in her deposition that "the termination notices were based on the investigation conducted by Penny." (Dkt. 87-1 at 144). This alone forecloses that possibility that Plaintiff's participation in Supinger's grievance "was the real reason for"—*i.e.*, the but-for cause of—her termination. *Foster*, 787 F.3d at 252. Rather, her termination was based on the facts as uncovered by the Penny investigation and the amply supported conclusions Defendants drew from them: That Plaintiff had made questionable, vacillating statements about the incident with Dawson and had allowed the personal friction between the two to interfere with her professional judgment and responsibilities as a law-enforcement officer.

Even setting aside Plaintiff's admission, her arguments about pretext fall short. Her effort to rebut the "lack of credibility" rationale merely challenges the "poor verbiage" of the termination notice and is essentially a lengthy quibble with the gloss placed on particular words

---

[18]     In a passing footnote and citing Va. Code § 19.2-271 (dkt. 94 at 17 n.23), Plaintiff "objects and moves to strike from the record all references to statements made by the magistrate" because she "is incompetent to testify." That statute—which makes a magistrate incompetent "to testify" in a case "as to any matter which came before" her in an official capacity—does not apply. First, the magistrate is not testifying. Second, her statements do not go to show the facts of the "matter" before her (*i.e.*, the Dawson-Plaintiff incident), only to show Defendants' state-of-mind/basis for termination (*i.e.*, the perception of the decision-maker who relied upon her statements). *See Riddick v. Angelone*, 105 F.3d 648 (4th Cir. 1997) (table decision). Third, the Federal Rules of Evidence, not state law, govern and do not appear to bar the statements. *See* Fed. R. Evid. 601, 605.

and phrases. (*See* dkt. 94 at 17-20).[19] As for the "abuse of authority" rationale, Plaintiff conclusory asserts that "[n]one of the bases given by Defendants to terminate [Plaintiff] justify any disciplinary action against[] her[,] much less termination." (Dkt. 94 at 21). No analysis, authority, or citation to the record is provided. Because merely questioning the wisdom, fairness, or correctness of Defendants' business judgment is insufficient, *Dugan*, 293 F.3d at 722, and because Plaintiff has not identified any evidence suggesting Defendants did not honestly believe their reasons for terminating Plaintiff, *Holland*, 487 F.3d at 217-18, Plaintiff has not satisfied her burden to show pretext.

### B.    Failure to Follow a Direct Order

Additionally, Plaintiff's other termination notice cited her failure to follow her superiors' order to "avoid contact" with Dawson when Dawson returned from medical leave. Defendants cite Plaintiff's own deposition testimony that she "probably could guess" Dawson was inside the bathroom when Plaintiff entered it on September 13, 2012. Plaintiff does not dispute that she received an order not to "get into any confrontation" with Dawson, or that she at least generally suspected Dawson was in the restroom on the day in question. She does, however, contest the exact scope of the order she supposedly violated, contend her deposition statement is taken "out of context," and relate the minute-by-minute timeline of the bathroom encounter in hopes of showing that Defendants' contention that she "prolong[ed]" contact with Dawson was a "manipulated" pretextual excuse. (*See* dkt. 94 at 14-17). Whether Plaintiff actually creates an inference of pretext is at least a comparatively closer question, although her statement that she

---

[19]    The one piece of potentially helpful evidence Plaintiff cites—an email from a DMV legal analyst to Defendants Hill and Thorpe defining assault and battery—does not give rise to a pretextual inference that they "were planning this aspect of [Plaintiff's] termination as far back as September 21, 2012." (Dkt. 94 at 19). Rather, it only shows that, soon after hearing of a potential assault and battery by one employee under their supervision upon another, Defendants thought it useful to seek legal advice as to what constitutes those offenses.

25

was "instructed not to interact with" Dawson is damaging. (Dkt. 87-5 at 13). Because Plaintiff must rebut each legitimate, non-discriminatory reason, and she has failed to do so, the Court need not reach the issue. *Baldwin v. England*, 137 F. App'x 561, 564 (4th Cir. 2005) (Plaintiff failed to show "any of those reasons are false, much less that all of them are a pretext"); *Odom v. Int'l Paper Co.*, 652 F. Supp. 2d 671, 691 (E.D. Va. 2009) *aff'd sub nom. Odom v. Int'l Paper Co.*, 381 F. App'x 246 (4th Cir. 2010) (Plaintiff must "meet each reason head on and rebut such reason").

## IV.     Delaying Entry of Corresponding Order for Administrative Efficiency

This Court found above that Defendants are not entitled to qualified immunity on Plaintiff's Due Process claim.     Although interlocutory appeals are disfavored, in certain circumstances they are permitted from *orders* denying qualified immunity. *See*, *e.g.*, *Hunter v. Town of Mocksville, N.C.*, 789 F.3d 389, 400 (4th Cir. 2015); *Ussery v. Mansfield*, 786 F.3d 332, 336-37 (4th Cir. 2015); *Davis v. City of Greensboro, N.C.*, 770 F.3d 278, 281-82 (4th Cir. 2014); *Hensley v. Koller*, 722 F.3d 177, 180-81 (4th Cir. 2013); *Cooper v. Sheehan*, 735 F.3d 153, 157 (4th Cir. 2013); *Iko v. Shreve*, 535 F.3d 225, 233-34 (4th Cir. 2008); *see also* Fed. R. Civ. P. 54(a) (A judgment is "any order from which an appeal lies"); 18 U.S.C. § 1291 (granting jurisdiction on appeal over "final decisions[20] of the district courts"). The Court need not decide whether an interlocutory appeal is proper here for it to acknowledge that Defendants would have a colorable basis to seek one after an appropriate order is entered. The Court also has explained the staggered procedural history of this case. That is, although the Due Process claim has been exhaustively briefed and argued, oral argument on the First Amendment claim will not

---

[20]     "The word 'decision' is equivalent to 'judgment,' broadly defined in Rule 54(a) as including 'a decree and any order from which an appeal lies.' Appeal may not be taken from an opinion as such[.]" *In re Forstner Chain Corp.*, 177 F.2d 572, 576 (1st Cir. 1949) (internal citations omitted).

26

concluded until January 13, 2016.  Importantly, one of Defendants' arguments against the First Amendment claim is qualified immunity.  (Dkt. 131 at 23-24).

The upshot of all this is the potential for two interlocutory appeals to the Fourth Circuit: One now if the Court enters an order on the Due Process claim, and another later if qualified immunity is denied on the First Amendment claim.[21]  The Court finds it a more efficient to place the two claims back on the same track.  That goal can be accomplished by postponing entry of the order accompanying this opinion until the companion decision on the First Amendment claim is prepared in early 2016.  That way, if First Amendment qualified immunity is also denied, both decisions can go to the Fourth Circuit together.  The only cost to this arrangement—a short delay of the potential appeal from the denial of Due Process qualified immunity—is marginal and will not prejudice Defendants, as the Court is sensitive to the fact that "qualified immunity 'is an *immunity from suit* [that] 'is effectively lost if a case is erroneously permitted to go to trial.'" *Ussery v*, 786 F.3d at 337 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (emphasis in original).[22]  Accordingly, the Court will withhold entry of an accompanying order to this opinion until it resolves the First Amendment claim on summary judgment.

The clerk is directed to send a copy of this opinion to all counsel of record.

Entered this ___7th___ day of January, 2016.

Norman K Moon

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

---

[21]     The Court emphasizes that it is not commenting on the merits of the First Amendment arguments.

[22]     Trial for this case is currently set for March 1-4, 2016.  (Dkt. 113).  The Court, of course, expects to decide the First Amendment claim and enter an order before then, and in any event adjustments to the schedule can be made as events warrant.

Case 6:14-cv-00013-NKM-RSB   Document 140   Filed 01/07/16   Page 27 of 27   Pageid#: 1889