IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | | |
|---|---|---|
| ANASTASIA V. WOOTTEN, | ) | |
|           *Plaintiff*, | ) | CASE NO. 6:14-CV-00013 |
| | ) | |
| v. | ) | |
| | ) | **OPINION** |
| COMMONWEALTH OF VIRGINIA, *et al.*, | ) | |
| | ) | **By: Norman K. Moon** |
|           *Defendants*. | ) | United States District Judge |

This discrimination and civil rights case is before the Court on Plaintiff's motion for equitable relief. The claims in this case were narrowed during litigation to a single count under 42 U.S.C. § 1983 for violation of procedural due process. The Court granted Plaintiff judgment on liability for the failure of remaining Defendants Richard Holcomb, Joseph Hill, and Jeannie Thorpe to provide post-termination process regarding her police officer position with the Department of Motor Vehicles. (Dkts. 140, 147). A jury convened to assess damages and awarded $183,483.76 in back pay, having found the denial of due process was causally connected to the loss of her job—*i.e.*, a post-termination hearing would have resulted in Plaintiff's reinstatement. (Dkt. 209).

The primary issue now in dispute is whether the Court should order reinstatement or front pay. The Court has received evidence and argument from the parties. Considering the fraught history between the parties and the special nature of law enforcement, the Court will award front pay for 2.5 years in lieu of reinstatement. The Court will also enter an injunction regarding expungement of certain records pertaining to Plaintiff's termination. Other incidental forms of relief—such as recoupment of retirement and insurance benefits, recertification training, and the calculation of interest—are also addressed below.

1

## I. REINSTATEMENT IS ILL-ADVISED IN THIS CASE.

Plaintiff wishes to be reinstated to her position as a senior special agent in DMV's Lynchburg office. Although she cites a passage in *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1423 (4th Cir. 1991), emphasizing "the strong preference in favor of reinstatement," that case recognizes that an alternative remedy is often acceptable. For instance, "reinstatement has not been ordered when the employer has demonstrated such extreme hostility that, as a practical matter, a productive and amicable working relationship would be impossible . . . [or] when the litigation itself created such animosity between the parties that any potential employer-employee relationship was irreparably damaged; . . . or when there was no comparable position available." *Id.* at 1423. Courts should account for "intervening historical circumstances" that might make reinstatement "impossible or inappropriate." *Id.* In sum, the Court undertakes "an analysis of all the circumstances existing at the time of trial for the purpose of tailoring a blend of remedies that is most likely to make the plaintiff whole." *Id.*

Plaintiff identifies out-of-Circuit cases stating that mere "mutual dislike" or routine acrimony stemming from typical litigation tensions are not sufficient to overcome the presumption favoring reinstatement. *See Hicks v. Forest Pres. Dist. of Cook Cty.*, 677 F.3d 781, 792 (7th Cir. 2012); *Squires v. Bonser*, 54 F.3d 168, 175 (3d Cir. 1995) ("more than the ordinary tensions accompanying an unconstitutional discharge lawsuit must be present"). She contends that the "chief source of friction and acrimony" in the office was Jennifer Dawson, who now works from home. Dawson, of course, was the co-worker with whom Plaintiff had a physical altercation and had arrested. At trial, testimony established that Plaintiff had Dawson arrested on a Friday night (September 14, 2012) at her home, making the arrest as uncomfortable and embarrassing as possible.

Plaintiff argues that the only continuing "ill-will" comes from DMV Commissioner Holcomb's trial testimony that he did not want Plaintiff back in the office and that he believed she was an unfit officer. The Commissioner—according to Plaintiff—"would have no reason to work closely with" Plaintiff (dkt. 217 at 5), and because she herself is not a supervisor, any concerns about reinstatement are mitigated. *See Bruso v. United Airlines, Inc.*, 239 F.3d 848, 862 (7th Cir. 2001). Still, the fact remains that Plaintiff would ultimately answer to "the same individuals who discriminated against [her] in the first place." *Id*. Moreover, although Dawson no longer physically works in the office, she apparently still has duties there that can be performed remotely and might require cooperating with Plaintiff, a tall order given their history. These facts cut against reinstatement.

Regardless, the central reason the Court will not order reinstatement is the toxic relationship between the parties, both pre- and post-initiation of this case.[1] Having overseen the case for more than two and a half years, the Court observes that this litigation has been unusually contentious. Indeed, the case is really the third in a trilogy involving the parties. First, Plaintiff filed suit in Richmond Circuit Court to disqualify DMV's counsel from administrative proceedings. The effort was unsuccessful, as was Plaintiff's appeal to the Virginia Supreme Court. Second, she asked the Roanoke Circuit Court to compel a hearing under state law, an effort which she abandoned.

Only after those two cases failed did Plaintiff initiate this action, in which she sued nearly a dozen members of DMV's leadership for far-reaching claims of gender and national origin

---

[1] It is also true that there is not currently a position open for Plaintiff to be reinstated to (dkt. 218-2 ¶ 4), although that difficulty could be managed by ordering that she fill the next available position. *See Duke*, 928 F.2d at 1423; *Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 385 (4th Cir. 2001) (citing *Spagnuolo v. Whirlpool Corp.*, 717 F.3d 114, 121 (4th Cir. 1983)); *Hunter v. Town of Mocksville*, No. 12CV333, 2016 WL 4272361, at *5 (M.D.N.C. Aug. 12, 2016).

discrimination, retaliation, and deprivation of constitutional rights.  In essence, Plaintiff accused the entire DMV chain of command of gross malfeasance and abuse of power.  Her complaint alleged that:  Defendants subjected her to "repeated interrogations" and fired her because she was a woman and of Russian origin; she was terminated in retaliation for opposing supposedly unlawful transfers of coworkers; her right to free speech was violated by Defendants when she was fired after contacted elected officials; and Defendant Hill unlawfully disclosed restricted personal information about Plaintiff to Richmond Capitol Police.   (*See* dkt. 1).  But none of these serious allegations against public employees and high-ranking DMV officials were substantiated, and the claims undergirding them were dismissed.  As for Defendants, since 2013 they have aggressively, consistently, and publicly maintained that Plaintiff is unfit to serve as a police officer, abused her position to further a personal quarrel, failed to follow direct orders from DMV leadership not to have Dawson arrested, and did not forthrightly describe the incident with Dawson.  In sum, while a fruitful working relationship between the parties may have once existed, cross-volleys of accusations crippled their cooperation some time ago.

The case itself has been aggressively litigated on both the law and the facts:  Including motions for reconsideration of summary judgment, the parties filed eight dispositive motions before trial (dkts. 16, 86, 88, 110, 130, 152, 163, 166), which generated six substantial memorandum opinions.  (Dkts. 46, 124, 140, 146, 161, 173).  This is in addition to several discovery disputes addressed by Magistrate Judge Ballou, as well as Defendants' failed request for certification of an interlocutory appeal, which also drew an opinion. (Dkts. 60, 76).  And all of this postdated DMV's extensive internal investigation conducted by Tom Penny, which subjected Plaintiff to multiple interviews and intense questioning.

Simply put, this litigation (really, series of litigations) between the parties has been

unusually contentious and hard-fought. It would be too much to expect the parties to set aside the animus engendered by the intense disputes and dueling allegations of misconduct underlying this case, which have now lingered over four years after the Dawson incident. *See Ford v. Cmty. Cash Stores, Inc.*, 14 F.3d 594, 1994 WL 14842, at *5 (4th Cir. 1994) (unpublished disposition) ("intervening circumstances," including "lapse of time since the firing" and "likelihood of animosity," supported award of front pay in lieu of reinstatement).

The parties' irreparable relationship is particularly salient in the context of law enforcement. Officers execute critical public functions: They conduct investigations, make arrests, and deal with the public daily, all while using their training and judgment. But they also must exercise those duties within the framework of direct orders from and broader goals set by leadership. Police units are "paramilitary" organizations where "discipline is demanded." *Maciariello v. Sumner*, 973 F.2d 295, 300 (4th Cir. 1992). The Fourth Circuit recently reaffirmed that this structure justifies a measure of "deference [that] applies with special force to police departments . . . ." *Liverman v. City of Petersburg*, -- F.3d --, No. 15-2207, 2016 WL 7240179, at *4 (4th Cir. Dec. 15, 2016) (quoting *Maciariello*); *see also Kelley v. Johnson*, 425 U.S. 238, 247 (1976) (according deference to police force in organizing its ranks on account of its unique purposes).

In other words, respect for the chain of command and one's superiors is paramount, as is the fair treatment of subordinates by supervisors. Public safety, to say nothing of other legitimate aims like efficiency and *esprit de corps*, requires it. Given all that has transpired between the parties, reinstating Plaintiff would not yield a productive working relationship, but a destructive and inefficient one that would likely invite more litigation. To mandate that relationship in a field as delicate as law enforcement would be ill-advised, a point bolstered by

Joseph Hill's testimony at the evidentiary hearing that Plaintiff's position does not lend itself to close supervision.[2]

In sum, the Court finds that, notwithstanding the preference for it, reinstatement in this case is inappropriate and unjustified. Front pay will be awarded instead.

## II. CALCULATION OF FRONT PAY

"[F]ront pay is simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001). Awarding front pay rests squarely within the district court's discretion, which must be "'tempered' by 'the potential for windfall' to the plaintiff." *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 504 (4th Cir. 2001); *see Dotson v. Pfizer, Inc.*, 558 F.3d 284, 300 (4th Cir. 2009) (same).

Courts can order front pay in cases, like this one, "in which reinstatement is not viable because of continuing hostility between the plaintiff and the employer . . . ." *Pollard*, 532 U.S. at 846. It also "can be awarded to . . . bridge a time when the court concludes the plaintiff is reasonably likely to obtain other employment." *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991).

In evaluating front pay, the Fourth Circuit has endorsed courts' consideration of the claimant's (1) age, (2) education and experience, and (3) diligence in attempting to secure

---

[2] Defendants also argue that reinstating Plaintiff would present DMV with *Brady* difficulties: DMV or prosecutors would be required to disclose that Plaintiff "has a credibility and/or judgment issue" in cases in which she might testify, thus hamstringing her ability to execute her duties effectively. (Dkt. 218 at 5–6).
While this could be a problem based, for instance, on the manner in which Plaintiff insisted Dawson be arrested, at present the issue is more theoretical than real. The core, immediate concern is the ineffectiveness of Plaintiff's re-employment with DMV. The lack of close supervision, her obvious inability to work in any capacity with Dawson, the intolerable prospect of her continued supervision by Defendants, and the likelihood that she may be *persona non grata* to other DMV employees all indicate that reinstatement is simply not feasible.

6

replacement employment. *See Dotson*, 558 F.3d at 300; *Loveless v. John's Ford, Inc.*, 232 F. App'x 229, 238 (4th Cir. 2007). District courts in this Circuit have also considered a variety of other factors, including length of employment prior to termination, how long plaintiff intended to work, prospects of comparable employment, time period of the award, how long other employees have stayed in comparable positions, and plaintiff's status as an at-will employee. *See Evans v. Larchmont Baptist Church Infant Care Ctr., Inc.*, 956 F. Supp. 2d 695, 707 (E.D. Va. 2013); *Spangler v. Colonial Ophthalmology*, 235 F. Supp. 2d 507, 509 (E.D. Va. 2002); *Xiao-Yue Gu v. Hughes STX Corp.*, 127 F. Supp. 2d 751, 761 (D. Md. 2001); *Ford v. Rigidply Rafters, Inc.*, 984 F. Supp. 386, 392 (D. Md. 1997); *Hunter v. Town of Mocksville*, No. 12CV333, 2016 WL 4272361, at *7 (M.D.N.C. Aug. 12, 2016).

Defendants cite the Seventh Circuit for the proposition that the initial burden of submitting data about a front pay award falls on Plaintiff. *See McKnight v. Gen. Motors Corp.*, 973 F.2d 1366, 1372 (7th Cir. 1992). But there, the failure to initially estimate "the amount of the proposed award, the length of time the plaintiff expects to work for defendant, and the applicable discount rate" meant only "the court may deny" front pay, not that it must. *Id.*

Plaintiff contends that, to the extent "essential data" is required from her, she met her burden by providing a proposed period (five years) and a base salary. *See Deltek, Inc. v. Dep't of Labor, Admin. Review Bd.*, 649 F. App'x 320, 334 n.9 (4th Cir. 2016). She also argues Defendants waived the issue, relying on a Virginia Supreme Court case placing the burden of discounting front pay to present value on defendants. *See CSX Transp., Inc. v. Casale*, 247 Va. 180, 186 (Va. 1994).

In any event, the calculation of front pay "should not be converted into a graduate seminar on economic forecasting." *Monessen Sw. Ry. Co. v. Morgan*, 486 U.S. 330, 341 (1988).

7

Several circuits hold that a district court can simply make a reasonable approximation of present value through the "total-offset method": Multiplying a present salary by the number of years of front pay, thus excluding future pay increases and roughly accounting for discounted present value. *See Xiao-Yue Gu v. Hughes STX Corp.*, 127 F. Supp. 2d 751, 763 (D. Md. 2001) (citing cases from Second, Sixth, and Seventh Circuits). This is an appropriate method here. Plaintiff has urged a five-year period of front pay at a 2012 base salary of $51,878.90, plus $6,850 in annual employer-paid benefits. (Dkt. 219 at 12–13). The Court adopts these per-year figures.

As for the length of time, consideration of several factors suggests a modest period of front pay, not five years as Plaintiff seeks. In favor of a moderate period: the jury found that Plaintiff would have been reinstated; Plaintiff was a tenured employee; the average term of service for someone in her position is eleven years (dkt. 218-2 ¶ 12); she served commendably prior to her termination; and, she has searched for employment since her termination. Cutting against an extended period of front pay are the facts that: Plaintiff is young, multilingual, and generally qualified to obtain respectable employment; Defendants, with their consent, are paying for lapsed law enforcement certifications should Plaintiff in fact wish to obtain a law enforcement position in the future; and she was not employed by DMV for a long period of time (two years) prior to termination. In light of the considerations above, the Court uses a period of 2.5 years. Plaintiff is entitled to **$146,822.25** (2.5 years * $58,728.90 per year) in front pay.

### III.  EXPUNGEMENT OF RECORDS REGARDING TERMINATION

Plaintiff seeks expungement "from her personnel file the two Written Notices entered into evidence at trial . . . along with all other [unspecified] records related to her dismissal. Essentially, [she] seeks restoration of her unblemished record." (Dkt. 217 at 11). The parties in briefing and at oral argument agreed: (1) the Written Notices from April 2013 (dkts. 204-1, 204-

8

Case 6:14-cv-00013-NKM-RSB   Document 235   Filed 12/30/16   Page 8 of 12   Pageid#: 3809

2) should be removed from her filed and not disclosed to potential employers; (2) copies of the jury's verdict and the Court's forthcoming judgment should be inserted into the file. The Court will order this relief.

The parties, however, disagree on how to handle the remaining documents obtained or generated by Tom Penny's internal investigation. Defendants express reservations about expunging these records—such as transcripts from Penny's interviews of Plaintiff and Penny's investigative summaries (dkt. 220 at 8)—based on the "fiduciary duty to the Commonwealth and its citizens to be forthcoming to any law enforcement agency" regarding their views of Plaintiff's fitness to serve as an officer. (Dkt. 218 at 8).[3] Thus, they seek guidance on "how DMV is to respond to [employer] inquiries to protect Defendants from further litigation." (Dkt 218 at 9). They claim that "DMV would be expected to turn over [Penny's] administrative investigation even if the Written Notices were removed from that file." (Dkt. 220 at 8).

The Court will not order expungement of the "Penny records," although neither should Defendants single them out for treatment different from similar documents of a former employee. Defendants observe that "the jury simply concluded that th[e] facts" in light of all the circumstances, including Plaintiff's prior service and evidence such as the Penny records considered by Defendants, "did not justify termination." (Dkt. 220 at 7). So while the jury found that presentation of the facts at a due process hearing would have shown that Plaintiff should have been reinstated, the verdict does not change what those underlying facts *were*. Thus, the Court will not expunge the Penny records. Defendants should simply treat inquiries from prospective employers about Plaintiff like any other inquiry about a former employee.

---

[3] Citing *Harrell v. City of Gastonia*, 392 F. App'x 197, 206 (4th Cir. 2010), Defendants argue that expungement is not a remedy for a due process violation. But *Harrell* is inapt; unlike this case, Mr. Harrell *received* due process from the defendants. *Id*. at 204–05.

9

## IV. RECOUPMENT OF RETIREMENT AND INSURANCE BENEFITS

The parties reserved the issue of recouping retirement and insurance benefits to the Court. Plaintiff requests $24,327 for lost retirement contributions, as well as life, disability, and health insurance contributions, to which she would have been entitled if not fired. (Dkt. 217 at 7–8 & n.4). Defendants agree that this is the correct amount. (Dkt. 218 at 12; dkt. 220 at 6). Thus, **$24,327** will be added to the jury award in order to make Plaintiff whole.

In calculating a front pay award, Plaintiff's benefits would be $6,050/year. (*See* dkt. 219 at 13–14).[4] Defendants do not challenge that amount or the entitlement to such benefits if front pay is awarded. Thus, **$15,125** (2.5 years * $6,050 per year) will be added to the front pay award.

## V. SICK AND ANNUAL LEAVE

Because Plaintiff is not being reinstated, the issue of reinstating sick and annual leave is moot.

## VI. CONTINUING EDUCATION AND TRAINING

Plaintiff observes that her law enforcement certification has lapsed since Defendants fired her; she argues they should cover the expenses of her recertification. (Dkt. 217 at 12). Defendants consent to paying these expenses. (Dkt. 220 at 2, 9).

## VII. INTEREST

### A. Prejudgment Interest

Plaintiff seeks prejudgment interest on her award of back pay. She urges a six percent rate. (Dkt. 217 at 10–11). Defendants agree to the six percent rate and "stipulate that the award of prejudgment interest should be calculated on each installment of Wooten's wages from the

---

[4] At the evidentiary hearing, Plaintiff testified that the yearly retirement contribution figure in her brief ($5,500) should have been $4,700. This accounts for the $800 difference between the total yearly benefit figure used above ($6,050) and the figure cited in her brief ($6,850).

10

date they would have been due, compounded annually." (Dkt. 220 at 6).

Applying the six percent interest rate compounded annually, assuming Plaintiff's salary (and employer-funded benefits) were paid bi-weekly, and using the date of termination as the starting point and the date of the jury's verdict as the endpoint, the total backpay award would be **$237,235.90**.[5]

### B. Postjudgment Interest

Postjudgment interest is calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a). The postjudgment interest rate published by the Federal Reserve on October 14, 2016 was 0.67 percent. "Interest shall be computed daily to the date of payment . . . and shall be compounded annually." 28 U.S.C. § 1961(b).

## VIII. SUMMARY OF CACLUATIONS

The following reveals the total amount due in the final judgment based on compensatory damages, front pay, and prejudgment interest:

---

[5] This amount was calculated by first taking the jury's verdict of $183,483.76 in lost salary. The Court then added $24,327 for the recoupment of retirement and insurance benefits. Thus, Plaintiff's total backpay award was $207,810.40 *before* prejudgment interest. The time period between Plaintiff's termination and the verdict was 184 weeks, which amounts to 92 biweekly pay periods. As a result, Plaintiff was entitled to $2,258.81 per pay period. To calculate the prejudgment interest, the Court calculated her pay for the first year ($58,729.03), calculated her interest for the year ($3,523.74), and then compounded the interest, yielding a total of $62,252.77. The next year's pay was then added, yielding a total of $120,981.79; interest was calculated ($7,258.91), and then the interest was compounded ($128,981.79). The same process was done for year three and the 14 pay periods of year four. Because interest was compounded annually, a prorated interest rate was applied for year four, as it was only 14 of the full 26 pay periods (6% x $^{14}/_{26}$). This yielded a total of $237,235.90, or $29,425.50 in prejudgment interest.

Finally, the Court notes that—to avoid unnecessary complications regarding interim awards between the verdict and final judgment—the date of the verdict has been treated as the date of judgment for purposes of calculating prejudgment interest.

BACK PAY:

     $183,483.76  (jury verdict for lost salary from firing to verdict date)
  + $  24,327.00  (lost employer-paid benefits from firing to verdict date)
  x    6% interest (compound annually from firing to verdict date based on bi-weekly pay)

       *SUBTOTAL*: $237,235.90 in compensatory relief.

FRONT PAY:

   $146,822.25 (Salary from 2012 * 2.5 years)
 +$  15,125.00  (future lost employer-paid benefits: $6,050 * 2.5 years)

       *SUBTOTAL*: $161,947.25 in front pay.

**TOTAL MONETARY RELIEF: $399,193.15.**

The Clerk is directed to send a copy of this opinion to all counsel of record. An accompanying final judgment will issue.

Entered this __30th__ day of December, 2016.

                                          _____
                                          NORMAN K. MOON
                                          UNITED STATES DISTRICT JUDGE